## AUGUST F. JAHNKE V. STATE OF NEBRASKA.*

FILED MARCH 18, 1903.   No. 12,979.

1. **Felony: PRELIMINARY EXAMINATION.** In a prosecution by information for a felony, in the absence of his waiver of a right to a preliminary examination, a defendant can not be put upon trial for the crime charged over his objections, until such preliminary hearing is accorded him, and he is held by the examining magistrate to await a trial in the district court.

2. **Plea in Abatement.** By the interposition of a plea in abatement after the filing of an information against one accused of a felony the question may properly be determined as to whether a preliminary examination has been had or waived.

3. **Preliminary Examination.** The statute providing for preliminary examinations contemplates that before a person can be proceeded against by information, he must be brought before an examining magistrate, charged with the commission of a crime, and that the magistrate shall proceed to hear the complaint, examine such witnesses as are produced in support thereof or to controvert the same, and then exercise judgment or discretion of a judicial character in determining from the evidence adduced whether the accused should be held to appear for trial in the district court, or should be discharged for want of probable cause, or because it is not made to appear that a crime has been committed.

4. **Plea in Abatement: PRELIMINARY EXAMINATION.** When the quantity or sufficiency of the evidence to justify the holding of a person to answer for a crime in the district court is called in question by a plea in abatement, and it appears that there has been a preliminary hearing in form and substance, and that evidence has been introduced in support of the complaint such as to invoke an honest exercise of judgment or discretion in the weighing of such evidence and in reaching a conclusion as to the order or judgment to be entered, and from which a fair legal deduction may be reached that a crime has been committed, and there is testimony tending to show that the accused committed the offense and he is held to await trial in the district court, a preliminary examination has been had within the meaning of the statute and the plea in abatement would be unvailing.

5. ———: **DEMURRER.** *Held,* That a preliminary examination within the meaning of the statute had been accorded the defendant in

* Rehearing allowed.   Judgment below affirmed.   See opinion, page 181, *post.*

the case at bar, and that the trial court' properly sustained a demurrer to his plea in abatement alleging that no such examination had been had.

6. **Change of Venue.** An application for a change of venue is addressed to the sound discretion of the trial court, and its ruling thereon will not be held erroneous, unless an abuse of discretion is shown.

7. ———. If, upon the showing made in support of and against an application for a change of venue, it does not appear that there exists reasonable grounds on which to found a belief that the defendant can not have a just trial in the county by a fair, unbiased and impartial jury, the trial court may properly overrule the application.

8. **Juror:** QUALIFICATION. Where, on a challenge of a proposed juror for cause on the ground that he has formed or expressed an opinion concerning the guilt or innocence of the defendant, it appears that such opinion is not unqualified and is formed from reading newspaper accounts of the transaction, or from common talk or rumor regarding the same, and that notwithstanding such opinion the juror is unbiased, and can impartially hear and consider the evidence and arrive at a verdict solely with reference thereto and the instructions of the court, uninfluenced by anything heard or read prior to the trial, the court may admit such person to sit in the trial of the case as a qualified juror.

9. **Challenge for Cause:** REVIEW. An exception by the defendant to a ruling of the trial court on a challenge for cause in a felony case, is not properly presented for consideration on review, where the juror is afterwards excused, and the record does not show the exhaustion of all his peremptory challenges, and that the proposed juror to whom the exception relates was excused by him in the exercise of his right of peremptory challenges.

10. **Evidence:** PRIOR ATTEMPTS TO COMMIT THE SAME CRIME. It is competent, in the prosecution of a person for murder, for the state to prove prior attempts by the defendant to kill the deceased, as tending to establish an intent to kill, and plan and design adopted and resorted to in the commission of the crime.

11. **Privileged Communication.** Statements made by one to an attorney in the capacity of a client communicating with his counsel, is a privileged communication, which can not lawfully be divulged by counsel, nor drawn from the witness on cross-examination without his consent.

12. ———. *Held*, in the case at bar, that the relation of attorney and client exists, and that the testimony sought to be elicited on cross-examination was properly excluded by the court.

13. **Principals in First and Second Degree.** Under the Criminal Code

of this state the law does not distinguish between principals in the first and second degrees.

14. ———: Where a person accused of the commission of a felonious homicide is present at the time aiding, abetting, and assisting or counseling and procuring its commission, and a felony is committed, then he is guilty in the same degree and to the same extent as though he had performed the act causing death.

15. **Instructions.** Where by the evidence it is conclusively shown that the defendant either committed the crime charged,—that is, murder in the first degree,—or is entirely innocent, noninstruction to the jury by the trial court with respect to the lesser degrees of homicide embraced in the charge alleged in the information is not erroneous.

16. ———. Other instructions given and refused, excepted to by the defendant, examined, and the ruling thereon *held* proper.

17. **Discharge of Jury:** LEGAL DISCRETION. The time which jurors shall be kept together before they are finally discharged because of their inability to agree on a verdict rests largely in the discretion of the trial court, but this is a legal discretion, and if legal rules and principles governing are transgressed, the action can not be upheld.

18. **Verdict.** Where the jury, after being kept together for an unusual length of time, have returned a verdict of guilty and there is nothing in the record inconsistent with the view that it was agreed to voluntarily by all the jurors solely from a consideration of the evidence and the instructions of the court unaffected by anything in the nature of coercion, the verdict will not be disturbed.

19. **Evidence.** Evidence examined, and found sufficient to support a verdict of guilty of murder in the first degree, as returned by the jury.

20. **Other Errors.** Other errors assigned examined, and found to furnish no sufficient basis for a reversal of the judgment.

ERROR to the district court for Box Butte county: WILLIAM H. WESTOVER, DISTRICT JUDGE. *Affirmed.*

*Robert C. Noleman* and *Benjamin F. Gilman* (on rehearing *Francis G. Hamer* and *Thomas F. Hamer*), for plaintiff in error.

*Frank N. Prout, Attorney General, Norris Brown* and *William B. Rose,* for the state.

HOLCOMB, J.

The defendant, August Jahnke, was tried and convicted in the district court of Box Butte county upon an information filed by the county attorney charging him with murder in the first degree. In the verdict returned by the jury, imprisonment in the penitentiary for life was fixed as the punishment to be inflicted for the crime of which he was found guilty. The homicide was committed by shooting one Michael Sirck in the right side and back with a loaded shotgun, the shot from which penetrated his lungs, causing death within four to six hours thereafter. The gun at the time the load was discharged, was in the hands of one Oliver Olson. The prosecution by the state was conducted upon the theory that the homicide was committed by shooting as above stated by Olson, who fired the shot with felonious intent and in pursuance of a prearranged plan between the defendant and Olson; the defendant at the time being present, aiding, abetting, assisting, and procuring the commission of the crime, and by reason thereof was a principal in the transaction. The motive actuating the parties was to procure insurance in the sum of $4,000, which prior thereto had been procured on the life of the deceased, payable to his estate; the defendant Jahnke being the sole beneficiary under a will executed in his favor by the deceased at the time of procuring the life insurance policy, and as a part of the same transaction. The life insurance money, according to the testimony of Olson, was to be divided equally between the defendant and himself after the doctor's bill and funeral expenses had been paid. As a part of the prearranged plan, according to Olson's version of the affair, the shooting of the deceased and his death by that means was to be accomplished, and thereafter be reported and treated as having been occasioned by an accidental discharge of the shotgun. The defense of Jahnke was conducted on the theory that the shooting was in fact

accidental, and that Olson's testimony to the contrary was manufactured by reason of influences and inducements exerted on and held out to him by the county attorney and the sheriff of the county and in the hope of receiving immunity for his participation in the crime. After the defendant's conviction, Olson pleaded guilty to murder in the second degree, which was accepted by the county attorney, and a sentence imposed by the court of twenty years' imprisonment in the penitentiary. The testimony of Olson disclosed that several prior attempts had been made to take the life of the deceased, all of which had proved unsuccessful, and that thereupon it was agreed between them that a shotgun should be procured and his death accomplished by shooting under the pretense that it was the result of an accident. The uncontradicted evidence goes to show that while the deceased, who was a bachelor, living alone, was sitting at the breakfast table at his home, the defendant being seated on the opposite side of the table talking to him, Olson came from an adjoining room through a partition door immediately to the right and to the rear of where the deceased was sitting, and that just as he passed through the door the charge in the gun was exploded, the shot striking the deceased in the right side or back near the spinal column, penetrating his lungs, from which his death soon resulted. The deceased at the time lived in the country some twelve miles from Alliance, the county seat of Box Butte county. The defendant and Olson had frequently stopped with him for meals and overnight when in that vicinity. The defendant, at the time of the homicide, was living at Alliance, but within a year or two prior thereto had lived on another farm or ranch in the neighborhood where deceased was living. Olson is a brother-in-law of the defendant. The morning preceding the homicide defendant, with his son, who was about eighteen years old, and Olson, drove from Alliance to the home of the deceased, where they remained over night. It was testified by Olson that the plan was to shoot the deceased on the same evening they ar-

rived at his home, but because of the presence of a rela-
tive who visited him during the evening, these plans mis-
carried.  During the night, says Olson, while he and the
defendant were occupying the same bed in a room by
themselves, it was agreed between them that they would
undertake to accomplish their object on the following
morning, and that the shooting at the time and in the
manner narrated was the final consummation of the con-
spiracy they were engaged in.

The record which is presented for review by defendant
is quite voluminous, and the petition in error contains
near three hundred assignments of alleged errors, of which
only those which are argued in brief of counsel will be
considered.  Some, even, of the assignments of error which
are argued are not deemed of sufficient importance to be
noticed and considered more than in a very brief way.

When called upon to answer the information filed
against him, the defendant interposed a plea in abatement
on the ground that there had been no preliminary examina-
tion of the offense of which he was informed against, such
as is by law required.  In the plea in abatement was set
out in full all the proceedings had before the examining
magistrate, including the testimony which had been in-
troduced at such hearing.  The county attorney filed a
demurrer to this plea, which, upon consideration, was sus-
tained by the court.  The ruling on the demurrer is now
assigned as error.  The contention of the defendant is that
while there was in form a preliminary inquiry to a limited
degree, it was not such as is required by law, and that the
evidence upon which the examining magistrate acted failed
altogether to show that any crime had been committed;
that the order of commitment on the evidence adduced
was entirely unwarranted and without legal justification;
and the district court therefore erred in holding, as it did
in effect, that the defendant had been accorded a prelim-
inary examination within the meaning of the law.  The
question directly presented to us, is what shall be the
standard by which to determine whether a preliminary

examination has been had such as will authorize a county attorney to proceed in the trial of a person accused of a felony, when such an examination has not been waived, and where at least a form of examination has been had, some evidence introduced, and a finding by the magistrate that a crime has been committed, and also that there is probable cause to believe the person charged guilty of its commission? It has frequently been held in this and in other jurisdictions that where prosecutions by information are allowed in the absence of a waiver by a defendant accused of crime of his right to a preliminary examination, he can not be put upon trial for the crime charged over his objections until such preliminary hearing has been accorded him and he held to await a trial in the district court, and that a plea in abatement is the proper method of determining whether or not such hearing has in fact been had or waived. *White v. State,* 28 Neb. 341; *Coffield v. State,* 44 Neb. 417; *Latimer v. State,* 55 Neb. 609, 70 Am. St. Rep. 403. In the case last cited it is said that the object of a preliminary examination before an examining magistrate is to ascertain whether the crime charged has been committed, and if it is found to have been, then whether there is probable cause to believe the accused committed it, and if such is found to be the case, to insure his appearance in the district court to answer the complaint by recognizing him to appear thereat, or, in default of recognizance, to commit the accused to jail until an information may be presented against him and he be required to answer for the crime charged. What the statute evidently contemplates is that when a person is charged with the commission of a felony, before he can be proceeded against by information he must be brought before an examining magistrate on such charge, and that the magistrate shall proceed to hear the complaint and examine such witnesses as are produced in support thereof or to controvert the same, and then exercise judgment or discretion of a judicial character, with which he is invested, in determining whether from the evidence ad-

duced, the accused should be held to appear for trial in the district court or should be discharged for want of probable cause, or because it is not made to appear that a crime has been committed. It was not, we apprehend, the intention of the statute that by a plea in abatement errors in the judgment of the examining magistrate should be corrected, or that the evidence introduced should be weighed for the purpose of determining its sufficiency, as might be the case by a reviewing court when the questions involved are those solely of guilt or innocence of the accused.

When the quantity or sufficiency of the evidence to justify the holding of a person to answer for a crime is called in question, as in the case at bar, by a plea in abatement, the only question to be considered is with reference to the powers of the magistrate which are called into action in the determination of what shall be the result of such hearing. If he is compelled to act judicially, and to determine as a judicial question the matters over which he has jurisdiction, and does determine such questions upon competent evidence, then an error in judgment as to the result reached can not be determined by a plea in abatement. It is only where there is in fact no preliminary examination, either in form or substance, that advantage can be taken of by such a plea. It is the rule in this jurisdiction that while the question of the sufficiency of the evidence introduced at a preliminary examination to hold an accused to answer for a crime with which he is charged may be raised and tried in habeas corpus proceedings, yet where it appears that the court had jurisdiction, that an offense had been committed, and there is testimony tending to show that the accused committed the offense, the court will not weigh the evidence further to see whether it was sufficient to hold the accused on the ground of probable cause. It is not necessary in such cases that the evidence should be sufficient to support a verdict of guilty, or show guilt beyond a reasonable doubt. *In re Balcom,* 12 Neb. 316; *State v. Banks,* 24 Neb. 322, 326; *Rhea v.*

15

*State,* 61 Neb. 15. We feel quite certain that when the same question is raised on a plea in abatement that the inquiry can go no further nor be entered into to any greater extent in the determination of such a plea, nor do we say that the sufficiency of the evidence may be inquired into to the same extent upon such plea as it can in proceedings under a writ of habeas corpus. We are disposed to the view that the true test should be whether in fact there was a hearing as to the crime charged in form and substance as contemplated by the statute, and whether the evidence introduced at such hearing is such as to invoke an honest exercise of judicial discretion, a bona-fide judgment or determination on the part of the examining magistrate by weighing and considering such evidence in arriving at a conclusion as to the order or judgment to be entered; and if such is the case, then it can not be said that a preliminary examination, within the meaning of the statute, which will support the filing of an information in the district court, has not been had. If, after the filing of a complaint charging a felony, the magistrate proceeds to inquire into the complaint by an examination of the witnesses offered by the state and the accused, and from the evidence thus adduced he is required to determine therefrom whether a crime has been committed, and whether there is probable cause to believe the accused guilty of its commission, and does so determine upon evidence sufficient in quantity to necessitate consideration and deliberation judicial in character in reaching a fair legal deduction and to justify an inference of probable guilt, when the party is held to answer the charge, the statute is satisfied, and a preliminary examination such as the accused is entitled to, in the absence of a waiver, has been accorded him. In the case at bar, as shown by the record of the preliminary hearing of the defendant before the county judge acting as an examining magistrate, two witnesses were sworn and testified for the state. The defendants offered no testimony, and were content, under advice of counsel, to rest on a motion to discharge them

for want of sufficient evidence to hold them to answer in the district court, which was presented after the state had introduced all the evidence offered in its behalf. The evidence introduced disclosed without doubt the commission of a homicide. The only question for determination by the magistrate in reaching a conclusion was whether or not the killing was excusable as the result of an accident. There was proof of the nature of the wound which produced death, the place where inflicted on the body of the deceased, and that the shooting was done while the gun was carried by Oliver Olson in the presence of the defendant. It developed at the hearing that the parties accused had stated that the shooting was accidental. The evidence showed that the parties accused had removed the clothing from the deceased when the physician, the first one who saw him after he was shot, arrived at his house. The course of the shot producing the injury was described, and the position of the parties at the time the shot was fired. It appeared that the clothing worn by the deceased at the time had been burned, evidently as a result of the explosion of the powder, and that when the gun was fired the person holding it was standing not to exceed four feet from the deceased; that from the relative positions of the parties, Olson, as he passed through the door, was immediately to the right of and quite close to the deceased, who was sitting in a chair at the table, and that when the gun was discharged the shot struck his body on the back and right side, ranging slightly downward and inward from his spinal column. From the whole of the evidence, the relative position of the parties, the way the gun must have been held, and the direction in which pointed, we think it manifest that legal deductions are fairly warrantable wholly inconsistent with the theory of an accidental discharge of the gun unaccompanied by any explanation other than the naked statement that the shooting was accidental. If the evidence made a prima-facie showing of the commission of a felony, or warranted a legal deduction that one had been committed, then the probable guilt

of the defendant followed as a logical and necessary sequence. Nothing is disclosed by the record of the preliminary examination as to any explanation offered concerning the details of the alleged accidental killing. All that appears is that defendants stated that the deceased was shot accidentally while Olson was carrying the gun as he came through a door near where deceased was sitting. We think that it is obvious that the evidence offered by the state was of such a nature as to call for an honest judgment on the part of the examining magistrate in determining what should be the result of the preliminary examination, and that his conclusion, reached from a consideration thereof, can not be said to be the result of an arbitrary order unsupported by evidence, or that no preliminary examination was in fact held. The examination, we have said, is for the benefit of the accused. It is not only to advise him of the exact nature of the crime with which he is charged, and ascertain whether there is probable cause to believe that he committed it, but also affords him an opportunity to relieve himself of an accusation, and dispel all probabilities of guilt by offering evidence in his own behalf. The defendant offered nothing to disprove the state's evidence, nor made any objection to the order of commitment save to move the examining magistrate to discharge him for want of sufficient evidence. He is not now, in our judgment, under the record, in a position to say that no examination has been had, or that he has been denied any right which is accorded him by the statute before he may be required to answer to the information of the county attorney charging him with the commission of the crime for which he was tried and convicted, and the ruling of the district court on the demurrer to the plea in abatement is, therefore, without error.

It is also argued that the court erred in refusing to grant a change of venue on the application of the defendant. In support of the motion there were filed the affidavits of the defendant, his son, who at the time stood

jointly charged with him with the commission of the
same offense, and four of the citizens of Box Butte county.
The affidavits of all save those of the attorneys for the
defendant in support of the motion were of a general
character, alleging, in substance, that the defendants could
not have a fair and impartial trial on account of strong
prejudice and bias of the citizens of the county generally.
The affidavits filed by the two counsel for the accused
narrated what a number of citizens, and especially those
residing in Alliance, are purported to have said, to the
effect that the defendants could not get a fair trial because
there was a strong prejudice existing against them and a
deep feeling that they were guilty of the crime charged;
that such parties would not sign affidavits in support of
the motion for personal and business reasons,—and that
the defendants could not, as the affiants believed, have a
fair trial in Box Butte county.  Much is set out in detail
in the affidavits of counsel as to what different persons
had said to those making the affidavits, and of the connec-
tion of the insurance company (a local organization) and
its principal officers with the transaction preceding the
homicide, and of their influence and standing in the county,
and of the feeling of defendants' guilt prevailing generally,
occasioned by rumors which had been set afloat in all
parts of the county.  There was also narrated the purported
expressions of a number of citizens of a positive and em-
phatic character concerning the defendants' guilt, and of
the impossibility of securing a fair, unbiased and impartial
jury to try them in that county.  The counter affidavits
offered by the state were signed by over a half hundred
of the citizens of the county, and were to the effect that
there has been no unusual feeling exhibited in the case,
or interest taken in the prosecution of the defendants;
that a large majority of the people knew nothing of the
merits, and, when the subject was mentioned, it was un-
coupled with any feeling of prejudice or resentment, and
that but few of the citizens were acquainted with the de-
fendants or the deceased; and that more than seventy-five

per cent. of the voters were absolutely free from bias, prejudice or opinion in regard to the guilt or innocence of the accused, and could serve as fair and impartial jurors, and that a fair and impartial trial by an unprejudiced jury could be secured in the county. In the counter affidavits of the state appear the names of several who, by the affidavits in support of the motion, it is said had expressed the opinion that a fair and impartial trial could not be had. As to all such there was a direct conflict between the affidavits made by themselves and what by the affidavits in support of the motion they are represented as saying. While the affidavits in support of the motion appear formidable, we think they must be reconciled with counter affidavits on the theory that counsel in their zeal and earnestness for their client have magnified every expression more or less unfavorable to their client's interest, which very probably found vent here and there, into a widespread sentiment and deep-seated conviction hostile to their client; and that the expressions of opinion of guilt from what had been heard or read in the newspapers which came to the ears of counsel were accepted as unmistakable evidence of bias and prejudice prevailing generally throughout the county, which would result in a conviction of their client in any event, who, to them, was guiltless of crime or wrongdoing. The motion was addressed to the sound discretion of the trial court, and its ruling thereon will not be held erroneous unless an abuse of discretion is shown. *Smith v. State,* 4 Neb. 277; *Stoppert v. Nierle,* 45 Neb. 105, 110; *Olive v. State,* 11 Neb. 1; *Lindsay v. State,* 46 Neb. 177, 181; *Welsh v. State,* 60 Neb. 101. The motion, we think, is without any merit, save by reason of the fact that the county of Box Butte is sparsely populated, and that by far the larger number of its citizens reside in Alliance, where an inquest was held over the body of the deceased, and where the preliminary examination was conducted, which necessarily must have resulted in giving quite general currency in that particular locality to the supposed facts and circumstances attending the

homicide and in relation thereto. There is altogether a lack of evidence showing unusual excitement, heated discussion or violent remarks by the citizens generally concerning the matter. Public feeling and sentiment apparently did not run high by reason of the homicide, but continued to flow in its accustomed channels. Those who became acquainted with what purported to be the facts doubtless formed opinions of a more or less fixed character, and probably some may have expressed themselves in strong language concerning the apparent atrocity of the crime and the venality exhibited in its perpetration. The citizens generally, however, did not allow the tragedy to ruffle their feelings nor disturb their minds to an extent beyond that which might reasonably be expected by reason of the happening of such an event in any peaceable and well-disposed community. Upon the whole the showing does not impress us as warranting the conclusion that there exist reasonable grounds on which to found the belief that the defendant could not have a just trial in that county by a fair, unbiased and impartial jury, and, such being the case, the court's denial of the motion for a change of venue can not be said to be erroneous. *Argabright v. State,* 62 Neb. 402; *Goldsberry v. State,* 66 Neb. 312.

Error is sought to be predicated upon the trial court's rulings on challenges for cause to certain of the jurors impaneled and sworn to try the defendant. The grounds of challenge in each and every instance relate solely to the qualifications of the several jurors objected to by reason of their having formed or expressed an opinion concerning the guilt or innocence of the defendant, based either on newspaper reports, or rumors, or hearsay concerning the occurrence. In no instance does it appear that any of the jurors to which challenges for cause were interposed by the defendant had talked with witnesses or others who purported to be acquainted with the facts nor to have been present at a coroner's inquest held over the body of the deceased, or the preliminary hearing before the examining magistrate, or to have heard of or read the testimony taken

at such hearings. Such an opinion as was held to or entertained by these several jurors arose exclusively from common talk or rumor circulating through the county, or by reading a newspaper account of the affair. An epitome of the *voir dire* examination of one of the jurors thus accepted over defendant's objection is here produced, which is a very fair illustration as to the qualifications of all those selected over defendant's objection, and which we regard as favorable to the views entertained by defendant's counsel as any that could be selected. In his *voir dire* examination on behalf of the state, juror Lorence stated that he had heard about the case; that what he had heard was just the common talk, none of the particulars; that he had never heard what purported to be facts from any person who claimed to know them; that he had read a newspaper account of the matter in the *Alliance Herald*, and that his opinion was based solely on what he had read and the common talk. On the examination on behalf of the defendant the juror stated that he was not acquainted with the defendant nor the deceased; that he thought he heard about the matter the next day; that he knew nothing about the coroner's inquest, and never talked with any one who claimed to know the facts concerning the case; that he heard what purported to be the motive for the killing, which caused him to form an opinion; that what he heard did not prejudice him against the accused; that the opinion he formed after he heard of the alleged motive was with respect to whether the defendants were guilty, and that he had the opinion at the time of the examination, and would believe that way until he had heard somehing different; that it would remain with him during the trial till he heard something that would change it, and that he could not go into the case with the same free mind that he would if he had never heard anything about it; that he had no prejudice, but had an opinion about the case; that it was such an abiding and fixed opinion as would stay with him during the trial of the case till he heard something to change it. When interrogated by the court, the juror

stated that all he had heard was from rumors and reading about the case in the newspapers, and that it was from these sources of information that he had made up his mind concerning the merits of the case, which would remain with him till he had heard something different as to what was the motive of it; that he knew nothing of the truth of the rumors, and that the opinion which he had he did not think would influence him in finding a verdict should he be retained as a juror; that he did not think it would influence him in any degree whatever; that he thought he could wholly disregard everything he had heard and read and render a verdict solely upon the evidence introduced at the trial and the instructions of the court, and that he would do so if selected as a juror. Thereupon the chal-. lenge was overruled, to which the defendant excepted. Other jurors, whose qualifications were in all respects substantially the same as the one whose evidence we have spoken of, were likewise accepted over the defendant's objection. By section 468 of the Criminal Code it is pro-- vided: "That if a juror shall state that he has formed, or expressed, an opinion as to the guilt or innocence of the accused, the court shall thereupon proceed to examine, on oath, such juror as to the ground of such opinion; and if it shall appear to have been founded upon reading news-paper statements, communications, comments, or reports, or upon rumor, or hearsay, and not upon conversations with witnesses of the transactions, or reading reports of their testimony, or hearing them testify, and the juror shall say, on oath, that he feels able notwithstanding such opinion to render an impartial verdict upon the law and the evidence, the court, if satisfied that said juror is im-partial, and will render such verdict, may, in its discre-tion, admit such juror as competent to serve in such case." This section has been frequently construed, and the rule now seems to be that if, upon the whole examination of a juror, it appears that notwithstanding what he has heard upon rumor or hearsay, or what he has read in the news-papers, he appears to be wholly free from any such pre-

conceived opinion or bias as would interfere with his determination of the question of the guilt or innocence of the accused solely from the evidence at the trial and the court's instructions, that he is a competent and qualified juror and it would not be an abuse of discretion to overrule a challenge for cause on that ground. In *Curry v. State,* 4 Neb. 545, 548, it is said that if a juror expresses any doubt of his ability to render an impartial verdict upon the law and the evidence, he should not, in the face of a challenge for cause, be retained; and that even where by his formal answers a juror brings himself within the letter of the statutory qualification, if the court should discover the least symptom of prejudice, or unfairness, or an evident desire to sit in the case, in justice both to the state and the accused the juror should be rejected. This rule was quoted approvingly in *Cowan v. State,* 22 Neb. 519, 523. In *Basye v. State,* 45 Neb. 261, it is held that the trial court should exercise a sound discretion in respect to the examination of jurors as to their qualification, and that in order to constitute prejudicial error a clear abuse of discretion must be shown. This rule has been reaffirmed in *Rhea v. State,* 63 Neb. 461, where it is held that greater latitude will be given in rejecting than in retaining a juror whose qualification to try the cause is challenged. In the late case of *Dinsmore v. State,* 61 Neb. 418, where the grounds of challenge were very similar to those in the case at bar, it is held that an opinion formed by one called as a juror in a criminal cause does not affect his competency, or afford cause for challenge unless it is unqualified as to the guilt or innocence of the accused of the crime charged, and that an opinion formed solely on rumor and newspaper reports will not disqualify a juror where it is shown that the opinion is merely hypothetical, and such as will not prevent his returning a fair and impartial verdict upon evidence adduced on the trial under the instructions of the court. We are disposed to the view that the qualifications of the jurors in the case at bar who were retained notwithstanding the exceptions of the defendant are not

open to question under the rule last announced, and that
there was no abuse of discretion such as would work a re-
versal of the judgment in the rulings of the trial court
on the challenges for cause made by the defendant.  A
full consideration of the *voir dire* examination of each
of the jurors accepted who were challenged renders it
manifest that the opinion which at the time was enter-
tained was founded upon the supposed facts of the case,
knowledge of which was gained by rumor or hearsay or
by reading newspaper accounts of the affair, and was not
of such a character as to interfere with a fair and impartial
consideration of the evidence adduced at the trial, and
reaching a verdict therefrom solely by a consideration of
the same under the court's instruction uninfluenced by
anything which had been heard or read prior to the trial.
In this day and age of rapid and widespread dissemination
of information concerning all current events of any public
interest it would be unfortunate, indeed, if the formation
of an opinion based solely on such knowledge and informa-
tion were to disqualify every person who had acquired the
information and formed a qualified opinion from serving
as jurors to try questions regarding which information
had thus been disseminated generally throughout an en-
tire county.  The effect would be to discount intelligence
and place a premium on ignorance.  The tendency would
be to have the most important questions of fact involving
life and property placed in the hands of those least capable
of reaching correct conclusions.  It was to avoid this very
condition of affairs that led to legislative recognition of
the fact that an intelligent juror, even though he had read
of or heard spoken what purported to be a narration of
facts concerning a transaction afterwards becoming the
subject of litigation, was as well or better qualified to
decide the questions of fact involved than one who, because
of ignorance or indolence, had received no knowledge con-
cerning the matter.  While scrupulous care should be ex-
ercised vigilantly for the purpose of having every ques-
tion of fact determined by an absolutely fair and impar-

tial jury, we can not believe it conducive to the desired end to exclude those who read the newspapers and are sensible of the rumors and common talk that gain currency upon the happening of any event of general public interest. As to one juror who was sworn to try the defendant, it was disclosed on his *voir dire* examination that he held a policy of insurance in the same company which issued the policy on the life of the deceased. This fact was made a ground of challenge for cause, the overruling of which is assigned as error. No reason is given in support of this contention, nor is our attention called to any rule of law by which it can be said a legal disqualification existed because of the fact mentioned, nor do we perceive any from an examination of the statutes with reference to the qualification of jurors to sit in the trial of a cause where a felony is charged. The information elicited was very proper for the purpose of enlightening the defendant regarding matters which he had a right to know for the purpose of advising him more intelligently in exercising his right to peremptory challenges; but the fact that the juror was a policy holder in the insurance company was no legal ground of disqualification. The rulings of the trial court regarding the qualification of the jurors who tried the cause must, we think, be held to be not prejudicially erroneous.

It is likewise contended that the court erred to the defendant's prejudice in overruling several challenges for cause to proposed jurors thereafter excused on peremptory challenges. To the writer it seems that these several rulings and the consideration thereof are entirely eliminated because the jurors did not sit in the trial of the cause. The ultimate question for our determination is whether the defendant was tried by a fair and impartial jury, such as is guaranteed him by the constitution; and such determination can be correctly reached by a consideration alone of the qualification of the jurors who were finally impaneled and sworn to try the issue presented by a plea of not guilty. *Loggins v. State,* 12 Tex. App. 65. The

authorities, however, are quite evenly divided on the question, and this court, so far as it has committed itself, is committed to the contrary doctrine. *Thurman v. State,* 27 Neb. 628. It is there held that where a challenge for cause is erroneously overruled, the fact that the juror was peremptorily challenged thereafter by the defendant would not cure the error. We are enabled in the present case to dispose of the exceptions now under consideration to our satisfaction without further passing on the question as to the waiver of error, if any there be, by excusing the jurors in the exercise of the right of peremptory challenges. What has been said as to the jurors who sat in the trial of the case applies with equal force to the rulings of challenges for cause to those who were afterwards excused by peremptorily challenging them. There may be some slight differences as to the grounds of challenge for cause, but in the main they are substantially the same. We have examined with some care the testimony elicited in the *voir dire* examination of these several proposed jurors, and do not hesitate to say that with scarcely an exception the court was clearly right in overruling the challenge for cause. But suppose it should appear, which it does not, that error was committed in one or two instances in passing on the challenges for cause as to these jurors afterwards excused by peremptory challenges, we can not say in the state of the record as we find it, that the exceptions were well taken, and were preserved so as to entitle the defendant to a review thereof in this court. The bill of exceptions discloses that nineteen peremptory challenges were availed of, three by the state and sixteen by the defendant. As to the individual jurors excused by the exercise of these several peremptory challenges the record is entirely silent. It will not be seriously argued, we apprehend, that, even though an error might be committed by a ruling on a challenge for cause, if the proposed juror was afterwards excused by the state in the exercise of its peremptory challenges that the defendant could predicate error on the court's ruling. If the state has ex-

cused the juror, then by no possible view of the question can it be said the defendant is prejudiced by the ruling of the court. Error, it is frequently said, must affirmatively appear, and all presumptions of regularity will be indulged in until the contrary is shown. It is thus made manifest that in no event can the defendant predicate error on the trial court's ruling, unless we can determine from the record not only that he exhausted all of his peremptory challenges, but that he did so in order to relieve himself of a juror who should have been excused by the court on his challenge for cause. We find no error in the rulings complained of.

Numerous assignments of error relate to the admission and rejection of evidence offered during the trial. Many of these assignments are of the most general character, and no effort is put forth by counsel to point out to us the principles of the law of evidence which it is claimed are violated, or by argument assist us in reaching a correct conclusion in respect thereof. Several pages of defendant's brief are devoted to an abstract statement of the evidence, interspersed here and there with suggestions that the evidence received or rejected was certainly erroneous, or highly prejudicial; no reason being given or argument made in support of the error thus alleged. We probably would be warranted in disposing of all these objections in the same summary manner by simply saying we observe no prejudicial error in the rulings complained of. We have, however, examined the evidence with some care, and are impressed with the view that the rights of the defendant were at all times respected and fully protected by the trial court, and that no just ground of complaint exists to its ruling regarding the admission and rejection of evidence.

It is contended that the court erred in permitting the witness Olson to testify as to prior attempts which had been made to take the life of the deceased, as this was permitting proof of the commission of other and independent crimes to establish guilt in the one on trial. The ob-

jection is untenable. According to the testimony of this
witness, he and the defendant had conspired together to
take the life of the deceased. To accomplish this object
they made three separate attempts—one by causing him
to fall into a well, one by poison, and one by shooting at
him with a revolver under the pretense that the shooting
was accidental. All of this testimony was pertinent, and
related to the ultimate fact sought to be established, to
wit, the intentional killing of the deceased. It was ma-
terial for the purpose of proving an intent to commit the
act, and of the plan and design adopted and resorted to
for its accomplishment. It possessed probative value in
establishing the truth of the matters as raised by the
issues, and, if believed by the jury, tended to establish
with greater certainty and stronger probability the felon-
ious homicide charged as finally committed. *Reinoehl v.
State,* 62 Neb. 619, and authorities there cited.

It is also contended that the court erred in not permit-
ting counsel for the defendant to cross-examine the wit-
ness Olson as to certain statements alleged to have been
made by the witness to the defendant's counsel while he,
with the defendant and his son, were under arrest, charged
with the intentional killing of the deceased. The proposed
testimony was excluded on the ground that it was a priv-
ileged communication, made to counsel while the relation
of attorney and client existed. We are satisfied the court
was eminently correct in its ruling. It is manifest that
the relation did in fact exist, and that the witness did not
waive the privilege which he was entitled to under the
law. While it is argued that counsel were retained only
by the defendant Jahnke, and that what Olson said was in
the capacity of a witness, or a third party in no wise re-
lated to counsel, we think it is entirely clear from the
record that both the witness and the defendant were at
the time jointly accused of the crime, and were then act-
ing in conjunction in preparing for their defense; that
Jahnke was acting as spokesman and leader in the em-
ployment of counsel, yet the employment was in behalf

of all the defendants charged with the crime, and the communications and conversations thereafter engaged in between the counsel and the witness Olson—especially the one sought to be elicited by the cross-examination objected to—were those of a client communicating with his attorney, and therefore he was entitled to the protection of the statute. While it is true that later on Olson declined to join with Jahnke in a defense to the accusation, or to further counsel with the attorneys he first counseled with, and who continued to act for Jahnke, it is too plain for argument that at the time of the statements sought to be elicited the relation of attorney and client in every sense of the word existed, and it would have been a gross violation of the rights of Olson to permit anything that was said between him and his attorney during such time to be given in evidence over his objection. *Spaulding v. State,* 61 Neb. 289; *Farley v. Peebles,* 50 Neb. 723, 729; *Nelson v. Becker,* 32 Neb. 99; *Romberg v. Hughes,* 18 Neb. 579.

Another complaint that is made is that the court erred in instructing the jury that if they found from the evidence beyond a reasonable doubt that the defendant Jahnke was at the time of the killing present, aiding, abetting, procuring, and assisting Oliver Olson in the commission of the crime, and that the killing was done with felonious intent, and with deliberate and premeditated malice, then the defendant Jahnke would be guilty as a principal in the transaction. It is contended that, in the absence of evidence showing some overt act at the very time of the killing on the part of Jahnke, he can not be held as a principal in the transaction; in other words it is said that, if guilty at all, it is as a principal in the second degree, or an accessory before the fact, neither of which offenses were properly charged in the information or supported by the evidence. The propositions contended for are unsound. Under the criminal jurisprudence of this state there exists no distinction between what is termed a principal in the first and second degree. If the defendant is guilty at all, it is as a principal.

He was never charged nor tried as an accessory. If he were present at the time of the commission of the homicide, as he indubitably was, and was aiding, abetting, and assisting or counseling and procuring its commission, and the killing was done purposely, with deliberate and premeditated malice, then he is guilty in the same degree and to the same extent as though he had fired the fatal shot. *Hill v. State,* 42 Neb. 503; *Hawkins v. State,* 13 Ga. 322, 58 Am. Dec. 517; *Brennan v. People,* 15 Ill. 511; *Williams v. State,* 47 Ind. 568; *State v. Shenkle,* 36 Kan. 43.

It is also argued that the court erred in instructing the jury only as to the law of murder in the first degree, and gave no instructions regarding the lesser degrees. Under the evidence it is obvious that if we give it a strict legal construction and application, the defendant was guilty of murder in the highest degree, and a verdict should be so returned, or he was entitled to an acquittal. It was the theory of the prosecution that the crime was committed purposely, and of deliberate and premeditated malice, and the evidence tended to establish such a theory, and all the essential ingredients of the crime of murder in the first degree, and none other. The defense was that the killing was purely accidental and therefore excusable. This was the issue submitted to the jury by the instructions of the trial court. No instructions defining murder in the second degree and manslaughter were requested at the time, and it is apparent from the evidence that such instructions would have been inappropriate.

It has been repeatedly urged in this court that instructions defining the lesser degrees of homicide when by the evidence the highest degree of the crime has been committed or the accused is guiltless, are prejudicially erroneous, and should not have been given; but the rule is established that such instructions are not prejudicial to the defendant, and he has no just cause of complaint because found guilty of a lesser degree of crime than the evidence warrants. *Kastner v. State,* 58 Neb. 767; *Russell v. State,* 66 Neb. 497. The noninstruction by the trial

16

court in the case at bar on the lesser degrees of the crime charged against the defendant was warranted by the evidence or the lack thereof, and on principle comes within a rule in this state which is firmly settled and which we see no good reason for departing from. In *Strong v. State*, 63 Neb. 440, it is held: "The court, in charging the jury, is only required to state the law applicable to the facts proved and those which the evidence tends to prove. So, where it is conclusively shown that the defendant either committed the crime charged or is entirely innocent, the failure to instruct with respect to other crimes, or inferior degrees of the crime, embraced within the facts alleged in the information, is not error." See, also, *Vollmer v. State*, 24 Neb. 838; *Botsch v. State*, 43 Neb. 501; *Fager v. State*, 49 Neb. 439.

Other instructions given are excepted to, as well as exceptions being taken to some requested by the defendant and refused, which we find upon examination were properly given and refused, which we pass without further notice.

It is also complained of that the defendant's rights were seriously prejudiced because of the time the jury were kept together deliberating on the evidence before finally reaching a verdict. It appears the jury retired to deliberate at noon on the 28th of May, and did not reach a verdict until five minutes before 9 o'clock P. M. on the 3d day of June. To accentuate the cause of complaint in this regard, it is alleged in the affidavits in support of a motion for a new trial that the jury, after deliberating for forty-five hours returned into the court and reported that they had agreed to disagree, to which the trial court responded that such a report was no verdict, and that the jury were really in contempt of court. After a statement by a juror to the effect that the report was only meant to express an inability to agree, and the court responding the jury probably did not understand or know what a verdict such as was returned meant, the jury again retired for deliberation, arriving at a verdict of

guilty at the time stated.   The affidavits in support of
the motion for a new trial because of the unusual length
of time the jury were deliberating are grounded on al-
legations to the effect that the jury were intimidated by
the incident just mentioned, and were afraid to return
into court and report their inability to agree, and were
improperly brought within hearing of angry crowds as-
sembled on the streets, and were intimidated by threats
of violence to return a verdict of guilty; and further that
scandalous and infamous reports of the trial were pub-
lished in the papers, which unduly influenced the jury
during their deliberation.   Counter affidavits were filed
by the state.  The trial court found—and, as we think,
rightly—that there existed no substantial cause for
charges of fear or intimidation or undue influences on
the jury in any way.   The evidence satisfies us, as it did
the trial court, that the deliberations of the jury were
free from baneful influences of any kind, and that the
verdict was reached as the result of deliberation and con-
sideration of the evidence uninfluenced by extraneous
matters.   In fact, there does not appear to have been any
undue excitement or any inflammatory reports or comment
in the newspapers, as contended for, during the delibera-
tions of the jury, or that they were brought within the
sphere of any such influences had they existed.   The more
serious objection, we think, and one which seems not to
be urged or relied on by counsel, is the fact that the jury
were held together for such an unusual length of time,
which suggests a possibility that the verdict arrived at
was not the result of perfect freedom of action, and was
not reached voluntarily by each member of the jury from
a consideration alone of the evidence and the instruc-
tions of the court.   The thought is suggested that the con-
clusion reached may possibly have resulted from weari-
ness, exhaustion, and the overcoming of opposition and
differences of opinion by force of numbers, and sheer
physical and mental inability of a few to withstand the
arguments and importunities of a majority of the jurors

for such a long period of time. If such were true, then the action taken results in a species of coercion rather than free action and voluntary agreement on a verdict by each individual juror. Such a condition could not be tolerated, and, if made to appear, would vitiate a verdict returned under such circumstances. On the contrary, if the jury were provided with suitable quarters, were able to sleep when nature required it, and were laboring under such surroundings and circumstances as permitted them to proceed leisurely and comfortably in their deliberations, and did in fact deliberate among themselves in an effort to agree until a final verdict was reached, which was the result of free and voluntary action on the part of all the jurors, the verdict could not be successfully attacked as being the result of coercion or undue restriction of freedom of action on the part of each and every individual juror composing the panel. The time which jurors shall be kept together before they are finally discharged because of inability to agree on a verdict rests largely in the discretion of the trial court, but this is a legal discretion, and if legal rules and principles governing and underlying the jury system are transgressed the action can not be upheld. There has been a time when jurors were treated as prisoners, and kept in confinement as are offenders against the law until a verdict has been reached; but present-day civilization does not comport with such methods. The functions of a jury are as important as those to be discharged by the court, and anything tending to restrain perfect freedom of action and voluntary agreement should not receive judicial sanction. If the verdict is the deliberate and voluntary act of the jurors, it will not be disturbed. *Russell v. State,* 66 Neb. 497. Errors must affirmatively appear, and we can not say from the record in the case at bar that the verdict was not an expression of the deliberate judgment of each member of the panel of jurors, unaffected by any undue restraint or unwarranted restriction of liberty of action on the part of each and all of them. There being nothing

in the record inconsistent with the view that the jury reached the verdict returned voluntarily. after due deliberation on the evidence, unaffected by anything in the nature of coercion or by fatigue or exhaustion, it should be left undisturbed.

It is argued that the evidence is not sufficient to support the verdict. The argument is based on the alleged improbability of the testimony of Olson, an accomplice, and the part taken by the defendant Jahnke in the commission of the alleged crime. We are of the opinion the evidence is sufficient to support the verdict. There is little doubt but that if defendant's contention of an accidental shooting is to be rejected, then his guilty participation is such as to stamp him the greater criminal of the two. It was his brain that conceived, planned and directed the execution of the heinous offense. It was his stronger will and vicious bent of mind that caused the commission of the crime. Olson was but as clay in the hands of the potter, used as an instrument to execute the plan of the other defendant. The jury determined the question of the guilt of the defendant as one of fact which was peculiarly within its province to decide, and having found that the homicide was in fact committed in the manner and by the means contended for by the state, and there being, in our opinion, sufficient competent evidence to support the finding, we can not rightfully disturb it.

Numerous other errors are assigned, which have been examined, and are found to furnish no sufficient basis for a reversal of the judgment, and the same is accordingly

AFFIRMED.

The following opinion on rehearing was filed June 22, 1905. *Judgment of supreme court vacated. Judgment of district court reversed.* HOLCOMB, C. J., *dissenting:*

1. **Murder:** EVIDENCE OF MOTIVE: ERROR. If upon trial of a charge of murder evidence is introduced by the state tending to prove that

the life of deceased was insured in favor of defendant as showing a motive for the alleged crime, it is error to exclude evidence tending to show that the policy of insurance was of very little, if any, value and that the defendant was aware of that fact.

2. Evidence of Accomplice. The evidence of an accomplice should be closely scrutinized. If it appears that such witness has willfully sworn falsely in regard to a material matter upon the trial, his evidence can not be sufficient, if uncorroborated, to support a verdict of guilty.

SEDGWICK, J.

At the former hearing it was thought that the evidence of the witness Olson was sufficient to require the issue as to the defendant's guilt to be submitted to the consideration of the jury, and that the jury having found the defendant guilty, the verdict was so far supported by the evidence as to require this court to affirm the judgment. It was said that the record is quite voluminous, and that there were nearly 300 assignments of error in this court. No exhaustive analysis of the evidence was attempted. Upon the motion for rehearing the court having re-examined the evidence with great care, there was doubt in the minds of the court as to the sufficiency of the evidence and a rehearing was therefore ordered mainly upon that question. We have since this last argument again carefully reviewed the record, and are convinced that the evidence is not of such a character as to exclude all reasonable doubt of the defendant's guilt. The whole case against the defendant rests upon the evidence of the witness Oliver Olson. It is claimed that there was evidence other than that of the witness Olson which tended to show a motive on the part of this defendant to commit the crime, but it is not contended that any other witness has testified to any fact or circumstance tending to show his guilt. The special motive for the crime is found in the fact that there were two policies of insurance on the life of the deceased amounting upon their face to $4,000. This insurance was payable to the defendant August Jahnke,

and there was evidence that the defendant had assisted in procuring the insurance and·had made some payments to the company thereon.    This insurance, however, was in a local company that had been in existence but a few months.    It was a mutual benefit association.    Evidence was offered that there had been but one death in its membership since its organization; that upon his life there was a policy of $2,000, and that there was only $500 in the fund available for its settlement.    It was also offered to prove that there was at the time of the death of the insured only about 300 members who could be assessed for the payment of the loss and that but a very small amount could be realized upon a policy of $4,000, and that defendant was aware of these facts.    This evidence was excluded by the court and an exception was taken by the defendant.

The evidence shows that there had been a long-time friendship between the deceased and the defendant Jahnke, and there is no intimation in the record, outside of the evidence of the witness Olson, that there had ever been any misunderstanding between them, or any reason to suppose that the defendant had any designs upon the life of the deceased. This evidence in regard to the value of the policy, together with evidence that the defendant knew of the facts showing the worthlessness of the policy, ought to have been admitted; and if we consider it as in evidence, the proof of the motive under the circumstances for the murder of a life-long friend is not very conclusive and in itself furnishes, of course, no evidence of the defendant's guilt.    It becomes then very important to carefully consider the evidence of the witness Olson, upon whose sole testimony this conviction rests.    He testified upon·the trial that the defendant and himself had planned the death of the deceased for the purpose of obtaining the insurance upon his life.    There were four separate attempts on their part to carry out this plan before it finally succeeded.

The witness and defendant both resided in the town of

Alliance. The witness testified that he had known Michael Sirck (the deceased) for ten or twelve years and that Sirck lived about fourteen miles northwest of Alliance in Box Butte county, Nebraska. That the witness and the defendant were at Sirck's residence about the 4th of March, 1902. The defendant Jahnke had a farm about two miles further from town than that of Mr. Sirck. The witness and defendant started from Alliance in the morning and reached Mr. Sirck's place about 1 o'clock in the afternoon. They found Mr. Sirck at home. They went out there "to take a pump out of Jahnke's well." They took dinner with Mr. Sirck, and then went up to Jahnke's place "to get out the pump and pipe out of Jahnke's well, and move it down to Mike Sirck's." After they had taken out the pump and pipe, the witness says:

"Well, there was a piece of pipe down in the well, and Jahnke he said, we will let Mike down there and let him get that piece of pipe and give it to him."

The questions then asked and the answers given by the witness were as follows:

Q. Well, did you let Mike Sirck down in the well?

A. We had a pulley and we put the pulley up in the tower, and put a clevis up there and let the rope on, and we put a board on one end of the rope and started in and let Mike Sirck down as far as the rope went, and when he got down to the end of the rope, as far as it would go, he said he was quite a ways from the water; and so we pulled him up again. Then we took a chain and put across from one post to the other and put the pulley on the chain, and then fixed the rope again and let him down with another small rope and a hook, so he could fish around for the piece of pipe.

Q. Well, after Mike got to the bottom of the well, what did you do?

A. Well, when he was down there, Jahnke said, Now let's hitch a team on the rope.

Q. Well, what did Jahnke say when Mike was in the bottom of the well?

A. He said, we will hitch a team on to the rope and pull Mike out, and when he gets pretty near to the top, we will cut the rope and let him down in the well.

Q. Did you hitch a team to the rope?

A. Mr. Jahnke got his team and took them around there and we pulled the rope up so far, so that we could get the clevis on, we had a clevis that was a square shape like, and then he said, you can drive the team, and when we get so far, we will cut the rope and make it appear that the clevis cut the ropes. And I said, no, you take the team, they are used to you.

Q. What did you do further?

A. Mr. Jahnke told me, he said, Yes, I will drive out. I will drive out and when he gets pretty near to the top of the well, you make a motion, and I will cut the rope. And he had his knife in his hand when he started.

Q. Did you draw Michael Sirck to the top of the well?

Q. Tell the jury what you did with Michael Sirck?

A. Mr. Jahnke started with the team, and his knife in his hand, and when Mike got pretty near to the top of the well, I raised my hand and Jahnke made one cut at the rope, but I didn't see how many times he cut, but he said he cut two or three times before the rope separated, he had one ply on one side of the clevis and two on the other, and Mike Sirck went down to the bottom of the well. And the water rebounded again and he remained on the curbing. There was curbing sticking out about a foot and a half from the well.

Q. Where did the defendant cut the rope?

A. He cut it close to the clevis.

Q. How close to the singletree that the horse was hitched to?

A. Right close up to the clevis that was on the whippletree.

Q. Now had you had any talk with August Jahnke prior to going out to Mike Sirck's relative to letting him drop in the well?

A. Yes, sir.

Q. What was that talk?

A. He said he had a great scheme on hand.

Q. Tell if you can what he said the scheme was.

A. He said he had the life of Mike Sirck insured and a will made out in his favor.

Q. What did he say, if anything, that he intended or proposed to do with Mike Sirck?

A. He proposed to me if I would assist him in killing Mike Sirck he would give me half of the insurance policy except to pay the doctor's bill and the funeral expenses.

This well, according to the witness's testimony, was 110 or 115 feet in depth. He says he thinks that Sirck fell about 100 feet. Olson called to Sirck immediately from the top of the well and asked him if he was hurt, to which Sirck answered that he was not. He was then assisted from the well and they all went to Sirck's house together. They remained there over night. The deceased seems to have suffered no inconvenience from the fall. On the next day the defendant and Olson planned the second attempt on the life of Mr. Sirck. Olson's account of this attempt, upon his direct examination, is as follows:

Q. What did Jahnke say to you about killing Sirck that night?

A. He said we had got to get rid of him some way, and Mike Sirck has an old revolver here, and there is something wrong with it, and you are pretty handy fixing a revolver; I will get Mike to let you fix the revolver, then I will have Mike get some cartridges and you take the gun and make an accidental shot and kill Mike Sirck.

\*      \*      \*      \*      \*      \*      \*

A. I put the cartridges in the gun as soon as Jahnke requested me, and Mike was staggering to one side of me, and I held the gun in my left hand in this position, and slipped the thumb over the hammer and pulled the hammer back, and let the thumb slip off and the gun went off.

\*      \*      \*      \*      \*      \*      \*

He testified that Sirck was not over two feet from him when he fired the revolver. Sirck immediately said he

was not hit, but they both thought that he was, and after remaining another night at Mr. Sirck's place, on their way home they discussed the matter between themselves and concluded that Sirck must have been shot in the stomach and would die. Mr. Janke then said "he thought he had better go out and see whether Mike was dead or not; and I thought it would be a good idea." Three days later Mr. Jahnke, according to this witness's testimony, went out to Sirck's place to see if he was yet alive, and having stayed over night, upon his return informed the witness that "Mike was not hurt a particle."

The witness then procured some corrosive sublimate and this is the way he tells what they did:

Q. State what August F. Jahnke stated to you in that conversation at that time.

A. Why, he said he didn't think a bullet would kill Mike Sirck, and he thought poison would be the best thing; he thought we had better get some poison, strychnine or arsenic, but if we got that, why, he would suspicion us.

Q. Well, did you get any poison?

A. Yes, sir. I told him that corrosive sublimate was about as strong a poison as there was.

Q. Did you get the corrosive sublimate?

A. Yes, sir. He told me to get the corrosive sublimate and I got it.

Q. Now, after you got this corrosive sublimate, what did you do?

A. Why, two or three days afterwards we started out to Mike Sirck's again, and we was going to bring the horses belonging to Jahnke.

Q. Well, did Jahnke—Who was it suggested if anyone did, the manner of using this corrosive sublimate to poison Mike?

A. August Jahnke.

*          *          *          *          *          *          *

A. When we got there we unhitched the horses and went to work and got dinner ready; and when we got

done eating Mike stepped outside and Jahnke said, I will go out and while Mike and I are hitching up, you can put the corrosive sublimate in the sugar. And they went out and I put the corrosive sublimate in the sugar, part of it.

\* \* \* \* \* \* \*

Q. Go ahead now and state what happened at supper that night.

A. At supper that evening, after we had supper ready, Mike Sirck set down and eat supper and took two spoonfuls of that corrosive sublimate and sugar and put in his coffee.

Q. What effect, if any, did it seem to have on Mike?

A. The first cupful didn't seem to have any effect on him. When he got that drank I poured another cup and put in two more spoonfuls of corrosive sublimate and sugar.

Q. What effect did that have on him?

A. He drank a little of it and said it tasted bad. \* \* \*

Q. After Mike had taken the second cup of coffee, what effect did it have on him that you could see?

A. I couldn't see any effect. After August said, my coffee don't taste good, and throwed it out, Mike said mine don't taste good either, and he threw it out.

\* \* \* \* \* \* \*

Q. Well, what did you do the next morning?

A. The next morning we got breakfast.

Q. What did Mike Sirck do, if anything?

A. Well, after we got breakfast, we sat down and eat our breakfast again. I poured the coffee out and Mike took two more spoonfuls of the corrosive sublimate and sugar and put in his coffee.

Q. What effect did it seem to have on him this time?

A. The first cup of coffee didn't seem to have much effect on him, and after he drank that he took another cup and put two more spoonfuls of the corrosive sublimate and sugar in it.

\* \* \* \* \* \* \*

Q. State if you know what condition Mike was in when you left.

A. After breakfast awhile, Mike said he thought that coffee was too strong for him, and so he took another small coffee pot and put some water in that and boiled some coffee that wasn't so strong, and when he got that cooked to suit himself, he poured a cupful—he had a small dipper, and he poured the coffee in and took a table-spoonful of sugar and corrosive sublimate, and put some bread in it and eat that.

Q. What effect did that have on him?

A. That didn't have any effect at all; it staid right with him.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Q. What did Mike Sirck drink for dinner that day?

A. Coffee.

Q. What did he put in the coffee, if anything?

A. He put some more of that corrosive sublimate and sugar in his coffee.

Q. State what was done if anything, with the sugar and corrosive sublimate when you left there that day?

A. It was left there. I think most of the corrosive sublimate was used.

The fourth attempt was successful. This is Olson's version of it:

Q. State whether he said anything afterwards, relative to the killing of Mike Sirck.

A. A few days afterwards, he said, we will go out there again, and he said, you take your revolver along. I said my revolver wouldn't be any good; I said the only thing that would be any good would be a shot gun, and I don't know whether that would be any good or not.

Q. What did Jahnke say?

A. He said, I will get the shotgun, and we will pretend we are going out hunting, and when we get out there you make an accidental shot and kill Mike Sirck.

They then went out to Sirck's place and arrived there about 2 o'clock in the afternoon. They took dinner with him. The witness was asked:

Q. State why the shot wasn't made that night, if you know.

A. Because Joe Wismiller came over.

Wismiller was a cousin of Sirck's. He stayed there about two hours in the evening. After he had gone the witness and Mr. Jahnke retired. They occupied the same bed. The witness was asked what the conversation was after they had retired and answered:

A. Well, he said, we can't do it to-night, but in the morning will do just as well.

Q. Who said that?

A. August F. Jahnke.

Q. The defendant?

A. Yes, sir.

Then comes the witness's statement of the killing:

A. We went on and got breakfast, and when we had breakfast ready, we waited awhile, Mike Sirck didn't appear; he had gone out after cattle. So we sat down and eat our breakfast, and we sat there probably five minutes before he arrived. While we were eating our breakfast, August Jahnke said, while Mike Sirck is eating his breakfast you can take the shot gun and accidently shoot him.

\*       \*       \*       \*       \*       \*       \*

Q. State what, if anything, you did.

A. Well, after Michael Sirck got his breakfast, or come back and set down to eat his breakfast, Jahnke was sitting on the east side of the table, and Mike on the west, and the boy was sitting in the room. And I went out in the bedroom and got the gun and come out through the door, and as I did so, I pulled the trigger of the gun and shot Mike Sirck.

Q. Where did you shoot him?

A. I didn't know just exactly where it hit him at that time.

Q. Did you find out afterwards.

A. Yes, sir, he was shot in the back.

The fall in the well was something over 100 feet, but

the consequences to Mr. Sirck were not serious. He went to his home that night as usual, a distance of about two miles, and next day was back at the well assisting in removing the pump and other materials. The attempt to kill him with a revolver was equally futile, although the weapon was supposed to have been discharged point blank against his body at a distance of less than two feet, and although both parties present felt confident that the bullet must have entered Mr. Sirck's body; so confident that notwithstanding Mr. Sirck was around the next morning as usual, protesting that he had not been hurt, they still went home with the belief that he must die from the effects of the shot, and several days afterward took a special journey to his place to ascertain his condition, and yet Mr. Sirck was not hit. Expert witnesses testified that a tablespoonful of corrosive sublimate would contain from 400 to 480 grains and that ordinarily three to five grains would cause death. It is, as its name indicates, a corrosive burning poison. If it touches human flesh it will cauterize it. Olson testifies that he put a tablespoonful of this poison into Mr. Sirck's sugar and that he believes the whole of it was used. That is, during about twenty-four hours Mr. Sirck must have taken from time to time in quantities sometimes larger and sometimes smaller enough of this poison to have killed at least 100 men, and suffered no injury from it except a slight vomiting which was very temporary in its nature. All of these three attempts upon his life together did not seem to have made any impression upon him. No one was found who had ever heard him discuss it, and although these two men who had planned these attempts at murder afterwards spent an evening in conversation with Mr. Sirck and his cousin Mr. Wismiller, none of these unusual circumstances were mentioned in that conversation. Mr. Wismiller was put upon the stand on behalf of the state, and an attempt was made to show that he had used some of the sugar that had been poisoned, and that it had but slight effect upon him, but no evidence was obtained of

any admissions or statements of Mr. Jahnke or Mr. Olson during the evening's conversation that they had with this witness and Mr. Sirck, nor was it shown that the unusual circumstances testified to by Olson were in any manner referred to during that conversation. If the unsupported evidence of an accomplice which furnishes so many indications of inherent weakness and incredibility is the only evidence of guilt, it becomes interesting and important to discover whether that evidence has been in any respect corroborated or in any respect contradicted by other evidence. So far as corroborating testimony is concerned, it may be said that it was shown that Mr. Jahnke borrowed or hired the shotgun which was the instrument that caused the death of the deceased. But as this was in the hunting season and as the person from whom the gun was obtained was in that business, loaning out, as he testified, three or four guns each day, this circumstance was as consistent with innocence as with guilt. There were some other unimportant circumstances of a like nature, nothing that can be said to furnish any substantial corroboration of the evidence of Olson. So far as contradictions of this evidence are concerned, it may be noted that the witness himself has contradicted it as strongly as it is possible for human evidence to do. Before he testified in this case he was a witness before the coroner's jury, and there in substance corroborated the testimony of the defendant and of his son Alfred Jahnke, who testified that the shooting was accidental; that while the deceased was sitting at the breakfast table the witness Olson came out of an adjoining room with his arms full of heavy fur overcoats and the shotgun lying across them, and as he passed through the door in some way struck the gun against the door frame which caused the discharge of the gun, thus inflicting the injury upon the deceased from which he died. Again after the trial when Olson was in the penitentiary he informed the officers there that he had given false testimony upon the trial and that he wanted to correct it. He made an affidavit in which he said:

"The testimony which I gave at the coroner's inquest upon the remains of Michael Sirck was the truth and was an accurate description of the manner the deceased met his death; I was coming out of the house, having three overcoats on one arm and a shotgun in the other hand; the gun struck on the frame of the door and was thus discharged; I did not know at the time the gun was loaded; my reason for changing my testimony at the trial was that I was told if I did not, I would either be hanged or get a life sentence in prison; I was not placed in jail while I was awaiting trial, but took my meals at a restaurant and slept in a hotel in charge of the sheriff; I did as the county attorney and sheriff told me. I had typhoid fever in 1898 and never fully recovered, and at times I do not know what I am saying or doing; I have pains in my head nearly all of the time.

"I make this statement to relieve my conscience and to right the great wrong I have done August F. Jahnke."

And the officers having notified the attorneys, Olson again in the most solemn manner under oath detailed the circumstance of the accident, as he called it, corroborating his former evidence before the coroner's jury and also the evidence of Mr. Jahnke upon the trial. In this sworn statement he explained that he had been induced to testify as he did upon the trial by promises and threats. He afterwards retracted this statement and again swore that the evidence he gave upon the trial was the truth.

If the testimony of an accomplice who can so readily change his evidence from time to time is alone sufficient to support a conviction of so serious a charge, still this record contains a conclusive reason compelling us to reject his testimony. The witness was not always explicit and positive as to his dates and other matters of that nature, but upon the question of the corrosive sublimate he was absolutely positive. He testifies that he bought five cents' worth of corrosive sublimate for this purpose at the drug store of Mr. Tillotson in Alliance. That he bought it on the Monday or Tuesday before Easter and carried it in his

coat pocket from that time until he used it in Mr. Sirck's sugar. He shows in his testimony clearly that he knew when Easter was, and he was clear and positive in his statement of the time and place, when and where he bought this poison. Mr. M. R. Tillotson, the proprietor of this drug store, was upon the witness stand, and testified that Olson had not bought any corrosive sublimate at his store at any time during that year. He kept a record of poisons sold, and had always recorded each sale, and never failed to record the name of the purchaser except in one instance which was in the year before. The witness appears to be disinterested and reliable and his cross-examination rather strengthened than weakened his testimony. If this witness is to be believed, the statements of Olson in regard to the purchase and use of the corrosive sublimate must be false, and if he is false in regard to this attempt upon the life of Sirck he cannot be believed in his testimony in regard to other attempts. It is true that questions of fact are to be determined by the jury, and ordinarily, where there is substantial conflict in the evidence, the verdict of the jury must be conclusive, but it is a rule of law that a witness who has wilfully sworn in regard to some material matter upon the trial is not to be believed upon any matters unless his testimony is corroborated.

Under this rule of law the evidence of the witness Olson can not be believed and the verdict of the jury is therefore unsupported.

The former judgment of this court is vacated and the judgment of the district court is reversed and the cause remanded.

REVERSED.

HOLCOMB, C. J., dissenting.

With all due deference to my associates, I find myself unable to agree to the views hereinbefore expressed. A re-examination of the record strengthens my convictions

relative to the correctness of the conclusions first reached and announced in the opinion heretofore filed. *Jahnke v. State, ante,* page 154. It is now held in the majority opinion that the evidence is insufficient to support the verdict of guilty as found and returned by the jury sitting in the trial of the case in the court below. I can not but feel that the conclusion thus reached trenches on the prerogative of that body of men who are the lawfully constituted triers of fact. That instead of the jury's finding, there is substituted the judgment of this court regarding purely questions of fact with reference to which there is much competent evidence both pro and con. I do not understand the law to be that a jury must disbelieve all of the testimony of a witness if uncorroborated, even though it may be shown that such witness has willfully sworn falsely upon the trial in a matter material to the subject of inquiry. The jury are the judges of the credibility of the witnesses and of the weight to be attached to the testimony of each and all of them. Nor do I think the necessary inference from the record is that the witness Olson, the accomplice of the accused in the crime, if one was committed, willfully or purposely swore falsly regarding any matter material to the issue raised by the defendant's plea of not guilty. That he may have been mistaken in many of the details narrated by him and failed to with precision and accuracy state all the facts as they actually transpired is probably true. He was laboring under great mental strain and excitement naturally attendant on one in his situation. But there is nothing to indicate to my mind that he is a willful perjurer or that he deliberately and purposely warped his testimony and spoke falsely in order to convict the accused. He had no object in doing this, and in adhering under conditions of a most extraordinary character to what he asserts to be the truth, he has brought upon himself a sentence of confinement of long duration at hard labor in the penitentiary of the state. While it is asserted by counsel for the accused that Olson is insane or is an imbecile, the whole history

of the case as disclosed by the record warrants no such conclusion. He is not a strong-minded man but rather the reverse. His will power can be overcome and it appears that he is easily influenced by others in whom he has confidence or with whom he is associated. He has not the strength of mind possessed by the average man of mature years. The case is a most extraordinary one in the criminal history of the state. That Michael Sirck was killed by a gunshot wound while the weapon, a shotgun, was held in the hands of Olson is beyond all peradventure of doubt. If the killing was done purposely there can be no reasonable doubt as to the accused's guilty participation in the crime nor as to his being the one who planned the homicide and executed the plan through the instrumentality of Olson, who it is shown by the evidence was a pliant tool in his hands and wholly under his influence. It is stoutly asserted that the killing was purely accidental. There is much in the evidence tending to prove that the accused had conceived the idea of encompassing the death of Sirck for the purpose of pecuniary gain and advantage and that in carrying into execution this idea, his plans were to have it appear that when death did result, it should be under such circumstances as that it might be said it was accidental. In other words that while the homicide was to be caused by forces purposely set in motion, yet it was to be given the appearance of having been the result of an accident. It is not, therefore, at all unreasonable that the theory of an accidental killing should have some color of support in the evidence adduced to establish the crime. The witness Olson had no personal interest to subserve nor motive for making an effort to fasten guilt upon the accused contrary to the truth for he too must also suffer from the exposure. It is almost unbelievable that a person of the mental capacity of Olson can manufacture out of whole cloth the startling story he narrates in his testimony. It is said that fools and children always speak the truth and this saying is, I think, quite applicable to the testimony of Olson. There is to his testimony a simplicity and di-

rectness which carries conviction of his effort to speak the truth of and concerning those things which his own senses have witnessed and experienced. In order to break down his testimony and to account for his change of attitude after the coroner's inquiry where he testified that the killing was accidental, it is boldly intimated by the defense that the sheriff and prosecuting attorney, two sworn officers of the county who are honorable and reputable citizens so far as the record discloses and presumably so till the contrary is shown, have violated their oaths and every principle of honesty and justice by conspiring together and with the witness for the purpose of convicting an innocent man by subornation of perjury. I unhesitatingly repudiate such thought as being altogether unsupported by any act or circumstance disclosed by the record and one which ought not even to have been suggested in proceedings of the gravity of those now under consideration. The evidence alone of the witness Olson covers, with objections, nearly 200 pages of typewritten matter in the bill of exceptions. The bill as a whole, in so far as it relates to the testimony of all the witnesses for the state and for the defendant, covers between 450 and 500 pages of typewritten matter. It is quite difficult if not impossible to give even a fair epitome of the evidence found in the bill of exceptions without extending this opinion to an unwarranted length. The jury heard these several witnesses testify, noted their manner of testifying, and their demeanor while on the witness stand and were, in my judgment, far better qualified to judge of the truth of the matters in controversy than we can possibly be by reading the record in cold, lifeless type.

The rule is well established that a person accused of crime may be convicted on the uncorroborated testimony of an accomplice. The weight to be given the testimony of such a witness is for the jury to determine after a careful examination of the same in the light of all the other evidence in the case. *Lamb v. State*, 40 Neb. 312; *State v. Sneff*, 22 Neb. 481. As I view the record, the testimony

of Olson is not only corroborated but, upon the whole, the record is bristling with facts and circumstances of a corroborative character all tending to strengthen and confirm the truth of his statements as to the essential facts and circumstances connected with the commission of the crime charged. I can only refer briefly to some of the important events in the series of transactions testified to. As to the immediate transaction resulting in the death of Michael Sirck, the evidence as it presents itself to me tends to disprove rather than to confirm the theory of an accidental killing. Manifestly, I think, the jury were warranted from a consideration of all the evidence in rejecting the accused's testimony and the theory of the defense as to the shooting being the result of an accident. Quoting from the majority opinion, which I think is a fair statement as to how the accident is supposed to have occurred, it is said: "That while deceased was sitting at the breakfast table, the witness Olson came out of an adjoining room with his arms full of heavy fur overcoats and the shotgun lying across them, and as he passed through the door, in some way struck the gun against the door frame which caused the discharge of the gun, thus inflicting the injury upon the deceased from which he died." The door in the partition opened into the room from which Olson was passing in going into the room where Sirck was sitting. Olson is a large man, being six feet four inches tall. The deceased was sitting at the table in the northwest corner of the room close to the partition wall and between it and the table with the door leading into the other room immediately to his right. The table was so close to the partition that there was just room enough to slip a chair between it and the table, as testified to by Jahnke himself. Sirck occupied this chair and his back must, therefore, have been almost against the wall. He was eating his breakfast and sitting with his face to the east. Jahnke, according to his testimony, was sitting at the end of the table facing the north and, according to Olson's testimony, at the opposite side of the table from the deceased and fac-

ing him. The partition door was so close to the deceased that, when the shot was fired as Olson came through the door, whether accidentally or otherwise, the burning of powder set fire to the clothing worn by Sirck. In no event could he have been more than three or four feet distant from the muzzle of the gun when the charge exploded. Jahnke says that at the time he was busy talking to Sirck and he did not look around at anything. "All at once" says he, "a shot went off and Mike (the deceased) fell against the wall. I heard Olson holler and looked round and he was out of doors, and 'I noticed the coats right there in this bed room door; they laid right in the center, three buffalo coats, and Oliver was out of doors." According to Olson, the accused was to sit at the table, although he had eaten his breakfast, and engage Sirck in conversation while Olson was to come through the door with the gun and have it accidentally discharged in order that the plan of killing might be successfully carried into execution. It is hardly to be wondered at under the circumstances that the accused was busy talking to Sirck at the time and that Olson sprang out of the door under the excitement of the moment.

The testimony of the physician who examined the wound was that the shot penetrated the body about five and one-half inches to the right of the spinal column, penetrating the vertebræ and shattering them and separating the ribs on either side from the vertebræ, some of the shot going inside of the thoracic cavity; that some of the shot had penetrated both lungs ·in the back part; that the direction or course of the charge was slightly downward, striking five inches to the right and going in a direction so as to strike the vertebral column; that it was not quite parallel but slightly in towards the center of the body, possibly a half an inch inward. From this evidence it appears that the gun-barrel was held in a position nearly level when the gun was discharged and that it pointed in a direction parallel with the back of the body of the deceased and almost parallel with the partition by which

he was sitting. Under these circumstances, the jury might very well reject as inconsistent the testimony to the effect that the injury was caused by the gun striking the side of the door frame as Olson was carrying it in his arms with the coats when coming into the room where Sirck sat immediately to his left.

The course taken by the charge of shot when they penetrated the body is a circumstance altogether in harmony with the statements of Olson that he purposely held the gun in such a position as to point directly toward Sirck's body with the gun-barrel on a level or approximately so, and low enough to strike Sirck where the shot entered his body, the range of the shot being parallel with the partition and the trigger of the gun pulled after the gun was clear of the door frame and opening. Concerning the alleged inconsistency or falsity of Olson's testimony relative to the attempt to poison Sirck with corrosive sublimate much is said about his taking spoonful after spoonful on several different occasions of this poisonous substance. Whether Olson's testimony of the purchase or the druggist's denying the sale was to be accepted as true was purely a matter for the jury. The jury were not forced to believe the druggist and disbelieve Olson. There is evidence tending to show that the druggist did not keep a record of the sale of poisonous substances and to whom sold in every instance as the law required, and he may not have done so in this instance. Olson testifies that he bought five cents' worth. He put only a portion of it in the sugar he says he thinks about half but that he poured a part of it in and made no effort to measure it. While he estimates it at a tablespoonful he, as I read the record, was referring to a teaspoon. He calls the spoon used to put sugar in the coffee a tablespoon. Five cents' worth of the poison would probably not exceed a half ounce. This could not be more than a teaspoon level full altogether. If I am correct in this respect, not over half of a level teaspoonful of the poison was placed in the sugar. He said he put it in the sugar bowl and then shook the bowl to mix the poison with

the sugar. The weight of this substance or specific gravity is testified to be the same as that of lead and to be in a crystallized form. It may have all settled in the bottom of the bowl. It is, therefore, not wholly impossible, even though Olson did buy the poison and did. put it in the sugar, that Sirck never got enough of it to produce fatal results nor more than enough to produce the nausea and sickness which Olson testifies followed the sweetening of the coffee which Sirck drank with the sugar taken out of this bowl. Wismiller, a witness for the state, testifies that he took the sugar that was in this bowl after the death of Sirck and that there was something in the bottom that looked like flour, and that the sugar had a queer taste and was thrown out. There is unmistakably in the record other evidence than given by Olson tending to prove that some foreign substance was found in the sugar bowl and that the sugar had an unnatural taste. Whether this was corrosive sublimate or whether Olson had been imposed upon by the druggist and something else given him instead of the poison and which he believed to be poison, or whether he was in error, is a matter of conjecture, but I do not think it can be said that he was willfully falsifying when he gave his testimony concerning this attempt on the life of Sirck. Concerning the revolver episode, there is evidence tending to prove that the accused and Sirck were engaged in a drunken debauch and the ridiculous attempt, as testified to, to terminate his life by the accidental discharge of the revolver in the manner testified to, may have occurred; and whether Olson's testimony respecting what was afterwards said as to the probable fatal termination of the attempt may not have had reference in fact to the poison rather than to the shooting is not free from doubt. The incident at the well is not so incredible as to compel the belief that there is no basis in truth for what is testified to have there transpired. The evidence establishes beyond reasonable doubt that Jahnke was instrumental and active in procuring insurance on the life of the deceased, and himself to be the beneficiary in a very large

sum of money in view of the situation of the parties, and in keeping the assessments paid in order to keep the insurance alive until after the death of Sirck. That he expected pecuniary profit and advantage therefrom can scarcely be doubted. Under the will which he was instrumental in having Sirck execute, he was the beneficiary of all of his property of whatsoever kind. Concerning the affidavit of Olson, made after the trial of the case while confined in the penitentiary, retracting what he had before testified to, it is, to my mind, very satisfactorily shown that this affidavit was procured by coercion and intimidation and in fear of bodily injury and that Jahnke was at the bottom of the forces set in motion which resulted in such affidavit. An affidavit by Olson's father in the record, if these affidavits may be considered, ought to satisfy the most skeptical that the influences for evil exerted over Olson after his incarceration in the penitentiary by Jahnke were but a continuation of those exerted by him leading up to and culminating in the tragedy in which Sirck lost his life. The retraction of Olson can be satisfactorily explained only on the theory that the two county officers procured and conspired with him to have him testify falsely in order to convict the accused, and this view of the case is not to be thought of or given the slightest recognition. As to the holding in the majority opinion that evidence concerning the financial standing of the insurance company was erroneously excluded, I copy from the brief of counsel for the accused: "August Jahnke was fully aware that this company had already refused to pay a policy of insurance on the life of one Bean in March, 1902. Jahnke had called at Noleman's office (one of the attorneys for the accused) and had fully discused the liability financially of this company. Noleman had told him that it was a mutual company and that it was unable to pay its losses; that it was started without money. He told him how he knew it and what the treasurer had told him. The accused knew full well that there would be no profit to him if Michael Sirck were to die." Again it is said: "He (Jahnke) knew the in-

surance policies were practically of no value. See testimony of Noleman 700, 701." The trial court, out of an abundance of caution, allowed the attorney to testify to all of these things just as narrated in the brief. I find no serious complaint in the original brief as to the exclusion of the evidence on which error is predicated in the majority opinion. The evidence offered and excluded on which error is predicated went no further than to show that the mortuary fund of the association did not exceed $500, that the membership was about 300 and that there was a death claim against the fund of $2,000, and that Jahnke knew of such facts before Sirck's death. The insurance company was a mutual concern doing business on the assessment plan and with assets consisting of the obligations of its members, and probably other available property, with power to assess its membership to pay losses as they would reasonably be expected to occur in the ordinary course of the business. For these reasons, the excluded evidence did not tend to show the company was not solvent and able to meet its liabilities on account of death losses as they occurred in the ordinary course of its business. I do not think that the exclusion of the evidence referred to affords any sufficient ground upon which to base a reversal of the judgment of conviction. The conclusion announced in the majority opinion must, I think, logically result in an acquittal. In all reasonable probability the state has offered all the evidence that can be adduced in support of the charge made in the information.

Viewing as I do the record as disclosing evidence sufficient to support the verdict of the jury, and finding no prejudicial errors of law, I am constrained to adhere to the views expressed in the former opinion and to hold that the judgment of conviction should remain undisturbed. I, therefore, respectfully dissent from the views now expressed by my associates.