GEORGE J. ST. LOUIS, PLAINTIFF IN ERROR, v. THE STATE OF NEBRASKA, DEFENDANT IN ERROR.

8 405
15 389
17 151
17 157
19 731
8 405
31 255
31 845
8 405
34 262
8 405
42 513
43 112
43 170
43 410
8 405
44 80
8 405
45 869
8 405
46 401
8 405
49 764
51 155
52 76
8 405
58 323
8 405
62 19

1. **Practice:** ERROR: INCOMPETENT EVIDENCE. If a witness for the prosecution in answer to a proper question give immaterial testimony prejudicial to the prisoner, which on objection is promptly excluded from the consideration of the jury, this is not ground for reversing the judgment.

2. ———: INCOMPETENT QUESTION. Neither is the mere asking of a question calling for incompetent evidence, but not answered, any ground of error.

3. **Evidence:** MOTIVE TO COMMIT CRIME. On the trial of a husband for the murder of his wife, evidence of his improper devotion to, and criminal intercourse with, another woman, both before and immediately after the commission of the alleged offense, is admissible as tending to show a motive to commit the crime.

4. **Petit Juror:** QUALIFICATION. If a juror on his *voir dire* examination, in a case depending upon circumstantial evidence, answer that his convictions are such as would preclude him from returning a verdict of guilty, where the punishment would be death, it is good ground of challenge for cause on the part of the state.

5. ———: ———. On a trial for murder in the first degree the state is entitled to a jury who can conscientiously, if the evidence warrant it, return a verdict which will subject the offender to the extreme penalty of the law.

6. **Separation of Jury in a Capital Case.** By section 484 of the criminal code, the jury may, even in a capital case, in the discretion of the presiding judge, be permitted to separate during the trial up to the time the case is finally submitted to them.

7. ———. And in case of such separation of the jury, in the absence of an affirmative showing in the record to the contrary, it will be presumed that the required admonition by the court as to their duty while separated was given.

8. **New Trial:** NEWLY DISCOVERED EVIDENCE. It is a general rule, applicable in capital as well as in other cases, that a new trial will not be granted on the ground of newly discovered evidence where such evidence would be cumulative merely.

9. ———: ———. In an application for a new trial on this ground, the statute expressly requires the applicant to show that the newly discovered evidence could not . with reasonable diligence have been discovered and produced at the trial.

10. **Evidence:** CERTAINTY OF PROOF IN CRIMINAL TRIALS. To warrant a verdict of guilty in a criminal case it is not required that the jury be convinced of the prisoner's guilt *"beyond"* a moral certainty, but it is enough if they are convinced of his guilt *to* a moral certainty.

11. **Weight of Evidence.** It is not error to charge the jury that "absolute, unequivocal, mathematical certainty of proof is not required" on a criminal trial.

12. ———. It is not error to charge the jury in effect that in determining the weight of evidence upon any given point in the case, they are not required to give equal weight to the testimony of each witness, but only such weight as, under all the circumstances, they believe him entitled to.

13. ———: TESTIMONY OF PRISONER. The interest which a witness has in the result of a trial may always be shown as affecting the value of his testimony; and it is not error for the court, in referring to the testimony of the prisoner given in his own behalf, to tell the jury that they were "at liberty to consider the great interest which he has in the result."

14. **Instructions:** HOW CONSIDERED. The true meaning and effect of instructions are not to be determined by the selection of detached parts thereof, but by considering all that is said on each particular subject or branch of the case.

15. ———: INSTRUCTIONS MUST BE APPLICABLE TO THE EVIDENCE. It is not error to refuse an instruction, although correct as an abstract proposition, which is not applicable to the evidence before the jury. Neither is it error to refuse instructions where others of substantially the same import have been given.

PLAINTIFF in error was indicted at the October term, A.D. 1877, of the district court for Dodge county, for the murder of his wife by poison on the thirtieth day of May previous. He was put upon trial there on the fifth day of February, 1878, but the jury did not agree upon a verdict and were discharged. The cause was then taken upon change of venue to Saunders county,

where a trial was had in April, 1878, a verdict of murder in the first degree returned against the plaintiff in error, and the date of execution of the sentence of death fixed for September 20, 1878. Having sued out this writ of error, the execution of the sentence was suspended, until upon the affirmation of the judgment below, Friday, April 18, 1879, was fixed by this court as the date for the execution of said sentence.

The record brought here, is very voluminous, consisting of over fifteen hundred pages of manuscript, and it would not be practicable to state even its substance. There is, in the opinion, a review and summary of the testimony, as well as comments upon exceptions to instructions given to the jury, upon the trial below, sufficient to an understanding of the points passed upon and decided by this court.

*E. F. Gray* and *W. A. Gray*, for plaintiff in error.

1. The district attorney should have been confined to the inquiry as to whether the juror's opinions were such as to preclude him from finding the accused guilty of an offense punishable with death. *State v. Arnold,* 12 Iowa, 479. *Com. v. Buzzell,* 16 Pick, 153. One of these jurors might have conscientious convictions, "under some circumstances, on the circumstance of evidence alone." What good intelligent man might not? The other "would want to be well satisfied," would want to be "perfectly satisfied." Have we a right to hang men without the jury being well satisfied—perfectly satisfied—of the guilt of such men? I especially call the attention of the court to the fact that neither of these jurors answered, nor was there any evidence at all to the effect that "his opinions are such as to preclude him from finding the accused guilty of an offense punishable with death," as required by

the third subdivision of section 468 of the criminal code. A juror is not subject to this challenge until his answers shall have brought him within the statute. His opinions must be such as to preclude him from finding the accused guilty of an offense punishable with death. *Commonwealth v. Webster*, 5 Cush., 295. *People v. Wilson*, 3 Parker Crim. R., 199. *Atkins v. State*, 16 Ark., 568. *People v. Steward*, 7 Cal., 140. *State v. Arnold*, 12 Iowa, 479.

2.  There were some eight days consumed in the trial before the jury, and during this time there were eight several adjournments of the court over-night, and one over Sunday, and for aught that appears in the record the jury were not put in the charge of a sworn officer during these adjournments, nor were they admonished by the court as required by section 484 of the criminal code.  The supreme court cannot, by intendment, supply any material proceeding which is entirely omitted, and these proceedings are fatally erroneous. *Jones v. State*, 2 Blackford, 475. *Finke v. Hall*, 8 Johnson, 437. *Beekman v. Wright*, 11 Johnson, 442. *Dodge v. People*, 4 Neb., 220. *Burley v. State*, 1 Neb., 385 (opinion of Mason, C. J., on page 301).

3.  The evidence of Mrs. Ryan was discovered after the trial and verdict, and it could not have been discovered with reasonable diligence before; and under the fifth subdivision of section 490 of the criminal code it was error to refuse a new trial for this reason. *Gardner v. Mitchell*, 6 Pick., 116. *Baker v. French*, 18 Verm., 460. *Waller v. Graves*, 20 Conn., 305. *Cochran v. Ammon*, 16 Ill., 316.

4.  The court erred in giving its instruction numbered 23. *Breen v. The People*, 4 Park., Crim. R., 380. *Com. v. Webster*, 5 Cush., 320. And in its instruction numbered 29, when the proof is equivocal, the jury should not convict.   There must be unequivocal cer-

tainty of the defendant's guilt to warrant a conviction. *Caw v. The People*, 3 Neb., 357. *U. S. v. Douglass*, 2 Blatchford, 207. *U. S. v. Martin*, 2 McLean, 256.

5. It is error for the judge to intimate to the jury that a material witness for the accused has great interest in the result of the action. *Lellgett v. Markham*, 57 Ga., 13.

*M. B. Reese, district attorney*, and *W. A. Marlow* for the State.

1. Conscientious scruples entertained by a person against capital punishment, if so great as to affect his verdict in cases where the evidence is circumstantial, is sufficient reason to sustain a challenge for cause, even though such conscientious scruples would have no effect upon his verdict in a case where the evidence was direct. This was so decided by the court in *Gates v. People*, 14 Ill., 433.

2. The whole scope of the case shows ample evidence to sustain the verdict. The symptoms and post mortem appearances are consistent with arsenical poisoning, and the finding of the arsenic by Prof. Haines, in large quantities, some of it in an absolved condition, some in its free state, and some glued down to the inner coatings of the stomach by an exudation of coagulated lymph, showing vital action of the blood. The motive, opportunity of the accused, and subsequent conduct all show clearly his guilt.

3. Instruction No. 23, given by the court on its own motion, is a correct definition of a reasonable doubt, and when taken in connection with the instruction which followed (No. 24) is a clear, concise and distinct definition, and defines reasonable doubt in such a plain and comprehensive manner as would convey to the mind of any competent juror its true meaning. Instruction 29, taken as a whole, is a true exposition

of the law on this subject. Instruction 36 was certainly favorable to the accused, as the only evidence to which the instruction could at all apply was to the testimony of the physicians, who, by the cross-examination of counsel for the accused, showed that they were on unfriendly terms with accused; and this instruction was in effect saying to the jury that position contended for by counsel for accused, that full credence should not necessarily be given to such testimony, to be correct; there was no other testimony to which it could at all have any reference, and hence instead of being injurious to accused, was for his benefit. Instruction 63 was correct, even standing alone; but when taken in connection with all the others, is a true explanation to the jurors of their duty, and in no way could tend even to confuse their minds regarding their duty, in giving the accused the benefit of any reasonable doubt. Instruction 52, 57, 58, and all the other instructions complained of, we do not think subject to the objections interposed.

LAKE, J.

No foundation was laid either in the original or the supplemental motion for a new trial for reviewing any question decided by the district court upon the admission or rejection of evidence. Nevertheless, in view of the great importance of the case, we have carefully examined the record as to the several rulings complained of in these particulars, and fail to discover any just cause for complaint on the part of the prisoner.

In this connection we will refer to certain items specially mentioned in the brief of counsel as being prejudicial to the prisoner. The first is the answer of Dr. Crabbs, the coroner, to a question put to him by the district attorney as to what notice he had of the

death of Mrs. St. Louis before holding the inquest, in which he said: "I received notice by petition with twenty-eight signers." We do not see how this answer of itself could have been in the least prejudicial. But, admitting its immateriality, as claimed on behalf of the prisoner at the time, it was promptly excluded from the jury, as was also the petition itself when subsequently offered in evidence on behalf of the prosecution.

Complaint is also made of the testimony of the witness Kief, who was called by the state, which tends very strongly to show improper if not even criminal intercourse between the prisoner and a Mrs. Bloomer, who then resided in Fremont. This testimony was clearly admissible, and, taken in connection with that of other witnesses, and especially when viewed in the light of the vile and lascivious letter written to this woman by the prisoner himself while incarcerated under suspicion of having poisoned his wife, furnishes a pretty reliable clew to the motive by which he may have been actuated in the commission of the crime. As tending to show a motive in the commission of the offense charged, it was proper evidence for the consideration of the jury.

Again, it being disclosed by the cross-examination of Dr. Abbott, one of the state's witnesses, that, professionally, he was not on friendly terms with the prisoner, on his re-examination he was asked by the district attorney whether the sole reason of such unfriendliness to the prisoner were not the fact, "that he has pretended by a forged diploma to be a graduate of a medical college, which you afterwards found to be false." Although this question was not answered, an objection to it on the ground of incompetency having been sustained, still it is urged that the mere asking of it was so well calculated to prejudice the minds of

the jury against the prisoner that a new trial should be granted. That the question was clearly incompetent there can be no doubt, and a prompt rebuke of the attorney propounding it would not have been out of place. But to hold the question a sufficient reason for a reversal of the judgment, even had it been specially urged in the motion for a new trial, would be going farther in favoring one on trial for crime than any court has yet gone, and, moreover, would be most unreasonable. We cannot so hold.

The record shows that R. L. Roberts and C. J. Whipple were called to serve as trial jurors in the case, and that, on the challenge of the district attorney, they were both rejected on the ground of incompetency. Their rejection is now assigned for error.

Roberts was first interrogated, and showing himself duly qualified to serve as a juror in all other respects, this question was put to him by the district attorney, "I will ask you the question again, whether or not in a case depending upon circumstantial evidence your convictions are such as would preclude you from returning a verdict of guilty, if the punishment would be death?"

Answer. "Yes, sir, it would."

And in response to two other questions of similar import substantially the same answers were made.

This examination clearly established the disqualification of the juror to sit in the case. His conscientious convictions would have prevented him from agreeing to a verdict of guilty, although the evidence, under the law, were such as to absolutely require him to do so. On a trial for murder, as in all other trials, both parties to the suit are entitled to a jury composed of fairminded, conscientious men. And their conscientiousness should be directed to the support of the laws, and not to their overthrow. The state, on such trial, is

entitled to a jury who can conscientiously, if the evidence warrants it, return a verdict which will subject the offender to the extreme penalty of the law. And what we have said as to the rejection of this juror will apply as well to that of Whipple. He showed by his examination that he was conscientiously opposed to the complete enforcement of the law applicable to the case in which he was called, and it would have been sheer folly to have permitted him to remain on the panel.

The second point urged in argument is, that during the several adjournments of the court from day to day, while the trial was in progress, the jury were not kept in charge of a sworn officer, nor admonished as to their duty while separated, as the statute directs. That this matter was not noticed in the motion for a new trial would be a sufficient reason for our refusal to consider it. We will say, however, that while it is the usual and perhaps the better practice in most capital cases thus to keep the jury together, there is no provision of our criminal code requiring it to be done. On the contrary, section 484 expressly provides for such separations up to the time when the case is finally submitted; and whether they shall be permitted or not in any given case is left to the discretion of the presiding judge. But even if separations were not permissible, there is nothing before us to show that any occurred. Separations of the jury, and the admonition required when they are permitted, are not necessarily a part of the record of a case, nor can they properly become so except some question be raised respecting them in the trial court, and preserved by bill of exceptions, showing affirmatively the act or omission complained of; the rule in such cases being, that whenever the facts stated are consistent with the duty of the court, and nothing is shown to establish a contrary

St. Louis v. The State.

theory, the presumption will be that the court acted properly. *Fillion v. The State,* 5 Neb., 351.

The next matter urged upon our attention, as ground for a new trial, is the alleged newly discovered testimony of Catharine Ryan, which it is claimed would contradict an important witness called by the state, and support the prisoner in his testimony as to a somewhat material circumstance. Mrs. Elwood, the wife of one of the attending physicians, assisted in caring for Mrs. St. Louis most of the time during the last two days of her sickness. She testified that on the afternoon of the day preceding her death, Mrs. St. Louis requested the prisoner " to give her something to prevent the vomiting and retching coming back." To this request she says the prisoner answered, " Yes, Mary ,I have a powder prepared for you, I prepared it while you were asleep, and will give it to you now." That thereupon he stepped to a sewing machine standing in an adjoining room, picked up a glass of water and spoon, and gave his wife a powder, at the same time giving witness to understand that it was magnesia. In his testimony the prisoner, while admitting the giving of a powder at the time stated by Mrs. Elwood, declared he did not get it from the sewing machine, but from a paper of magnesia standing on a cupboard shelf in the kitchen. From the affidavit of Mrs. Ryan it appears she would swear substantially that at the time in question she was at work in the kitchen, washing dishes. That the prisoner took a spoon from the spoon-holder, went to the cupboard in the kitchen and filled it from a paper of magnesia which she had noticed standing on the shelf for several days. That after giving the magnesia to his wife he returned the spoon to her to be washed.

It might be a sufficient answer to this proposed testimony, to say that it would be cumulative merely. In

such case the general rule is that a new trial will not be granted on account of it. *Loeffner v. The State*, 10 Ohio State, 598. *Scofield v. Brown*, 7 Neb., 221. It would be but a repetition, in substance, of what St. Louis has himself testified to already, and in addition to this fact, we do not think its production could possibly change the result. But, aside from all this, it is not shown that the least diligence was exercised before the trial in ascertaining what Mrs. Ryan would swear to, with the view of calling her as a witness. The prisoner must have known what Mrs. Elwood would say on this point, for she had testified against him on a former trial of the case. He knew also that Mrs. Ryan was in his house at the time referred to, and it would seem that common diligence would have prompted an enquiry of her as to whether she had heard or seen anything while there that could possibly advantage him. Furthermore, the statute authorizing new trials on this ground expressly requires the applicant to show that the newly discovered evidence "could not, with reasonable diligence, have been discovered and produced at the trial." Section 490 criminal code. *Fillion v. The State*, 5 Neb., 351. *Heady v. Fishburn*, 3 Neb., 263.

We will next refer to such of the instructions to the jury as seem to be relied on as ground of error. It is contended that the prisoner was prejudiced by the explanation given of the term "reasonable doubt," as embodied in the twenty-third instruction, in these words: "A reasonable doubt is one which exists in the mind of a reasonable man after giving due weight to all the evidences, and such as leaves the mind in a condition in which it is not honestly satisfied, and not convinced beyond a moral certainty of the guilt of the accused." While this definition is, we think, open to criticism, it is certainly very far from being prejudicial

to the prisoner. By it the jury were, in effect, given to understand that before they could legally convict the accused they must be satisfied *beyond* a moral certainty of his guilt. This was exacting a higher degree of certainty in the proof of guilt than the law requires. It is enough to warrant a verdict of guilty if the jury are convinced *to* a moral certainty of the truth of the charge. This instruction therefore was more favorable to the prisoner than in strictness it ought to have been, and he has no reason to complain.

The twenty-ninth instruction was also excepted to. It was in these words: "Absolute, unequivocal, positive certainty is not required in any case. Mere speculation or contingent doubt may be found in connection with almost all human affairs. Absolute, unequivocal, mathematical certainty is rarely attainable, and this would be a degree of perfection not required of the jury by the laws." Perhaps there is a greater and more dangerous display of adjectives indulged in here than was necessary, or even advisable, but we do not think there is any reason to suppose that the jury were at all misled thereby, especially when taken in connection with other portions of the charge, in which the degree of proof necessary to a conviction was specially and carefully commented on. And as to the use of the word unequivocal, to which exception is particularly taken, we can see no objection to it in this connection. The object of the instruction, taken in connection with several others of similar import, evidently was to impress the minds of the jury with the impropriety of indulging in unreasonable, captious doubts, as is not unfrequently done, in order to escape the legitimate effect of morally satisfactory evidence. The proof of guilt may not be unequivocally certain, and still be morally satisfactory and convincing, which is all that the law requires.

St. Louis v. The State.

Error is charged in the thirty-sixth instruction, where the jury were told that, "In determining upon the weight of evidence upon any point in the case" they were "not required to give equal weight to the testimony of each witness." There was no error in this. Taken together with what immediately follows in the same instruction, it was but the statement of a fundamental principle in the law of evidence, that only such degree of credit should be accorded to each individual witness as, under all the circumstances, the jury believe him entitled to.

The fifty-second instruction, or paragraph of the instructions, is objected to. Referring to the theory of the prisoner's counsel, that if arsenic were found in the viscera of the deceased it had been put there after death, the judge said: "But on the contrary, if you believe such proposition to be in conflict with the evidence of the case, you would be justified in disregarding the same and in removing such theory from further consideration." In deciding upon the propriety of this instruction it must be borne in mind that in this immediate connection the jury were told that, "If the evidence on this point creates a reasonable doubt in your minds of the guilt of the defendant" he "would be entitled to the benefit of such doubt." And that if they were "not satisfied beyond a reasonable doubt that the deceased died from the effect of arsenical poison they must acquit the defendant." We see nothing here at all prejudicial to the prisoner or of which he has the least reason to complain, and the charge of error is entirely unfounded.

In the sixty-third instruction the jury were told, in substance, that if they found the indictment "fully proven" it was their duty to convict the prisoner. Fault is found with the words *fully proven*. It is contended that their effect was to take "from the jury the

29

St. Louis v. The State.

essential legal qualification of reasonable doubt, and was calculated to mislead them." We regard this criticism as entirely unwarranted. The jury were told time and again what amount of evidence was necessary to justify a conviction. What was necessary in order to *fully prove* the offense charged was so frequently and so pointedly presented to their minds by the court that they could not possibly have understood these words as relieving them from the duty of requiring the proof of all the material allegations of the indictment, beyond a reasonable doubt, before returning a verdict of guilty. The true meaning and effect of a charge to a jury cannot be ascertained by selecting a sentence here and a line or a word there, and looking to them alone, but all that is said on each particular subject or branch of the case must be looked to in order to reach a just conclusion respecting it.

It is insisted that by another instruction the court in effect told "the jury they should not credit the testimony of the defendant given in his own behalf." This is an unjust criticism of the charge. In commenting on the right of the jury to determine the degree of credit to be given to the several witnesses, they were told that while by the law of this state the accused was a competent witness for himself, still they were not required to accept his testimony as being absolutely true; and that in determining the degree of credit it was entitled to, they were "at liberty to consider the *great interest* which he has in the result." This was all very proper. The interest which any witness has in the result of the trial may always be shown as affecting the value of his testimony. That the prisoner, whose life was at stake, was vitally interested in the trial, cannot be questioned; and it was not error for the court to state as much to the jury. Not only were the jury, as told by the court, "at liberty to consider"

this interest, but it was their duty to do so in determining the credit to be given to the prisoner's testimony.

There are several other objections made to the instructions, in the brief of counsel, but they are generally in the nature of technical criticisms of detached sentences rather than a fair discussion of the whole charge taken together, which we have already remarked is not the proper mode of examination. There is, however, a general complaint of unfairness to the prisoner, and that a large portion of the charge is "improperly argumentative," and containing an "exhortation to convict." As to all this we will only say that we have read and re-read the entire charge, noticing particularly the passages to which our attention was specially directed by counsel, and believe it presents the law of the case very fully and fairly to the minds of the jury, and in as favorable a light to the prisoner as in reason could be asked.

As to the several instructions, requested on behalf of the prisoner, with the exception of the eleventh, which was wholly inapplicable to the testimony, they were but a repetition, in substance, of what were given in the general charge prepared by the court. It was not error therefore to refuse them. *Clough v. The State*, 7 Neb., 320.

Finally, it is urged that the verdict is unsupported by the evidence. On this point we have bestowed much time and reflection with the view of ascertaining whether any other reasonable conclusion than that of the prisoner's guilt could possibly be reached. An extended discussion of the evidence, voluminous as it is, would not be in place here, but we will notice, very briefly, some of the more marked features of the case, which we think the testimony clearly establishes.

The first reliable account that we have of the last

sickness of Mrs. St. Louis commences some eight days
before her death, when Dr. Borglum was called to treat
her.   It is conceded that whatever medicines she took
before this time were prescribed by her husband, the
prisoner, who had treated her for several days.  It is very
clearly shown, that from the time Dr. Borglum was call-
ed, up to her death, the deceased had many of the more
prominent symptoms usually present in cases of arsen-
ical poisoning.   She had "cold and clammy extremi-
ties," an "intense burning pain through the chest,"
a peculiar "hacking cough," most violent "vomiting
and retching," and at times "excessive thirst."   In the
language of the deceased herself to one of the wit-
nesses who called to see her, she "drank a great deal,
and wanted to drink all the time."   In addition to
these marked peculiarities, the case was so entirely un-
controllable by the use of the usual remedies resorted
to, where these symptoms are the result of natural dis-
eases, as evidently to astonish and confound the two
physicians then in charge of the case.   Especially was
this so from the time when the prisoner administered
the powder which he claimed was magnesia.

We have also a post mortem examination, conducted
in the most prudent manner—the removal of the stom-
ach, the liver, and the duodenum—and a subsequent
analysis by a most able and accomplished chemist and
toxicologist, Professor Haines, of the Rush medical
college, Chicago, resulting in the discovery, in these
organs alone, of over nine grains of white arsenic, of
which over six grains were in the stomach and duo-
denum, to say nothing of the quantity that must neces-
sarily have become absorbed and carried by the blood
into other parts of the system.   That this quantity of
arsenic was found in these organs, that it was admin-
istered to Mrs. St. Louis during life, and that it was
sufficient to and did cause her death, are propositions

too well established to admit of any doubt whatever. But did the prisoner administer it? That is the vital question. The jury by their verdict have said that he did, and they said it on what we conceive to be ample evidence to justify that conclusion. There has not been even a suggestion that the deceased took this arsenic of her own volition. Her evident desire to live, and her beseechment of her husband and the other physicians for something to alleviate the terrible "retching" and the intense "burning pain," from which she was suffering, together with her whole conduct, as exhibited by the evidence, forbid such a suspicion even. It is shown, too, that the only persons who were in a situation to have enabled them to give the poison were Dr. Borglum, Dr. Elwood, Mrs. Elwood, and the prisoner. Drs. Borglum and Elwood both give a clear and doubtless truthful statement of their prescriptions and treatment while they had charge of the case. Mrs. Elwood was also on the stand as a witness. She was a warm personal friend of the deceased, staying with her and kindly ministering to her wants most of the time during the last two days of her suffering. There is not a breath of suspicion attaching to either of these persons.

It is certain that each one of them did all that was possible to alleviate her distress and restore her to health. And it is through the watchful care of Mrs. Elwood that the administration of a powder—which had not been prescribed by either of the physicians then entrusted with the conduct of the case—by the prisoner was detected. Dr. Elwood coming in shortly after this powder had been given was so astonished at the changed condition of his patient, whom but a short time before he says he left apparently better, that he remarked to his wife, who was in attendance, "What have you been giving her?" Mrs. Elwood answered, "I haven't been giving her anything except what you

left." But afterwards, from information from his wife, Dr. Elwood said to the prisoner, "Doctor, you gave her a powder while I was gone." To which he answered, "Yes, I gave her a powder of magnesia. She was begging me to give her something, and I gave her that, thinking it would be as harmless a thing as I could give her until you came back." From this time the patient grew rapidly worse, suffering from that intense burning pain in the stomach of which she complained, until the next day, when she died.

The giving of this powder by the prisoner, under the circumstances, together with the violent effects which it at once produced, we regard as very strong evidence against him. Dr. Elwood was right there in the town at the time, and had special charge of the treatment to be pursued. He had stepped out of the house but a short time before "to go up town," leaving medicines of his own prescription to be given while he was gone. He was expected back every moment, according to the prisoner's own statement to his wife, when he gave this powder, which he had prepared "while she was asleep." This evidently was the fatal dose. The two grains and over of pure white arsenic found still undissolved in the stomach of the deceased confirms this belief.

In addition to this we have strongly criminating evidence in the conduct of the prisoner soon after his arrest for this crime. In the letter written by him to Mrs. Bloomer, before alluded to, filling some five pages of legal cap, not a single sentence is to be found that would be expected from a kind and affectionate husband unjustly charged with the murder of his wife. Much of it is devoted to foul allusions respecting his intercourse with other women before referred to. The bribery of the magistrate, before whom his examination was to take place, is therein distinctly suggested

as a means for securing an acquittal. 'And, alluding probably to the fact that arsenic had been discovered in the viscera by the analysis, he said: "The mere finding of arsenic is no proof of guilt against me, because they can't prove that I gave it, and I can prove that she didn't die of poisoning." But in all of this long letter there is not one single expression of sorrow for the excruciating suffering and, untimely death of his wife, nor a single manifestation of regret for the great loss to himself and his children.

But we will pursue this subject no further. We are satisfied the prisoner has had a fair trial. We find in the record no error prejudicial to him. There is ample evidence to justify a verdict of guilty, which the jury, on their oaths, have found, and when we have said this our duty is discharged.

JUDGMENT AFFIRMED.