BERT M. TAYLOR v. STATE OF NEBRASKA.

FILED MAY 20, 1910.    No. 16,342.

1. Indictment: SUFFICIENCY. An indictment charging murder while perpetrating and attempting to perpetrate a rape upon Pearl Taylor, referring to that person as "her", is good without alleging that person to be a woman, and is not vulnerable to a demurrer or motion to quash on the ground of duplicity.

2. Continuance: DISCRETION OF COURT. An application for a continuance is addressed to the sound discretion of the court, and its ruling thereon will not be disturbed where no abuse of discretion is shown. *Argabright v. State,* 62 Neb. 402.

3. **Criminal Law:** CHANGE OF VENUE: DISCRETION OF COURT. A motion
for a change of venue in a criminal prosecution is addressed to
the sound discretion of the trial court, and unless there has been
an abuse thereof its ruling on the motion will not be disturbed.
*Sweet v. State*, 75 Neb. 263.

4. **Jury:** IMPANELING: CHALLENGE FOR CAUSE. A challenge of a juror
for cause raises a question which is to be decided by the trial
judge from a consideration of all the facts developed during his
examination, and any circumstances which tend to enlighten
upon the matter, and of these are the appearance and actions of
jurors while undergoing the examination. An opinion formed
from reading newspaper accounts, or from common talk or
rumor, if the juror is unbiased and can impartially decide upon
the evidence, does not disqualify him. *Rottman v. State*, 63 Neb.
648.

5. **Criminal Law:** HOMICIDE: CIRCUMSTANTIAL EVIDENCE: INSTRUC-
TIONS. In a criminal prosecution for the crime of murder com-
mitted whle perpetrating or attempting to perpetrate a rape,
where it is necessary for the state to rely upon the facts and
circumstances surrounding the transaction, and the condition
of the deceased immediately following the tragedy, in order to
establish the manner in which the killing took place, it is proper
for the court to instruct the jury as to the nature and effect of
circumstantial evidence.

5*a*. ————: ————: DEFENSES OF INSANITY AND INTOXICATION: IN-
STRUCTIONS. In such a case, where the defenses of insanity and
intoxication are relied upon by the defendant, it is proper for
the court to instruct the jury on those questions, including the
legal effect of so-called insane delusions.

6. ————: TRIAL: MISCONDUCT OF JURY. It appears that during the
trial the jury were taken to a picture gallery, conducted by the
bailiff's wife, and were photographed. They were also taken by
the bailiff, in a body, to the Methodist church on Sunday, and
attended divine worship. It also appears that the jury did not
communicate with any other person or persons, nor was any
other person or persons suffered to communicate with them, and
it was not made to appear that anything occurred upon either of
those occasions which could in any manner prejudice the substan-
tial rights of the defendant. *Held*, That while such conduct on
the part of the officer is not to be commended, and should not
be indulged in, it is not sufficient ground, under the circum-
stances of this case, to require a new trial.

7. ————: ————: ARGUMENT OF COUNSEL. In his closing argument,
counsel for the prosecution charged *arguendo* that counsel for
the defendant were trifling with the court and jury by present-

ing the defenses of insanity and drunkenness, when they knew, or ought to have known, that there was no merit in them. This language was objected to, and the objections were overruled. *Held*, That the remarks complained of were within the limits of fair and reasonable discussion, and are not sufficient to require a new trial.

8. ——: ——: ADJOURNMENT. It appears that the court adjourned the trial in this case from Saturday night, May 29, to Tuesday, June 1, because of the fact that Monday, May 31, was to be observed as "Decoration Day." It not appearing that such adjournment in any manner interfered with the defendant's rights, *held* not sufficient ground for a new trial.

9. ——: ——: RECORD: PRESUMPTIONS. Where the record fails to show affirmatively that the court, before passing sentence upon the defendant, informed him that a verdict of guilty had been found against him, as required by section 495 of the criminal code, and in the absence of any showing in the record to the contrary, the fact that such information was given will be presumed.

10. Evidence examined and found to be sufficient to sustain the verdict.

ERROR to the district court for Kearney county: HARRY S. DUNGAN, JUDGE. *Affirmed.*

*J. L. McPheely* and *Hamer & Hamer*, for plaintiff in error.

*William T. Thompson, Attorney General,* and *George W. Ayres, contra.*

BARNES, J.

Bert M. Taylor, hereafter called the defendant, was tried in the district court for Kearney county on an indictment containing two counts, charging him with murder in the first degree. The first count alleged that the defendant killed one Pearl Taylor, intentionally, with deliberate and premeditated malice, by choking her to such an extent that she died of the wounds, hurts and bruises inflicted thereby. The second count of the indictment charged the defendant with a violation of the provisions of section 3 of the criminal code, by killing

the said Pearl Taylor while perpetrating and attempting to perpetrate a rape upon her. The jury found the defendant guilty as charged in the second count of the indictment, and fixed the death penalty, as his punishment. To reverse the judgment rendered upon the verdict, defendant has brought the case to this court.

The record contains many assignments of error, some of which were abandoned upon the hearing, and those which were urged as grounds for a new trial will be considered and disposed of in the order of their presentation.

1. Defendant assigns error for the overruling of his motion to quash and his demurrer to the indictment. His contention is that it is nowhere alleged in the second count of the indictment that Pearl Taylor was a female. We think this contention is without merit. It has been frequently held that an indictment for the crime of rape need not allege that the female raped or assaulted was of the human species, that she was a person in being, that she was a female child or woman, if the other words show sex. 33 Cyc. 1439. In *Battle v. State*, 30 Am. Rep. 169 (4 Tex. Ct. App. 595), it was said: "An indictment charging an attempt to commit a rape upon 'Theresa Gaudaloupe', and referring to that person as 'her', is good without alleging that person to be a woman." To the same effect are *Warner v. State*, 54 Ark. 660; *Joice v. State*, 53 Ga. 50; *State v. Hussey*, 7 Ia. 409; *Tillson v. State*, 29 Kan. 452; *State v. Warner*, 74 Mo. 83; *State v. Farmer*, 26 N. Car. 224; *State v. Barrick*, 60 W. Va. 576. If this be the rule when charging the crime of attempting to commit rape, it would seem that the allegations of the indictment in this case are sufficient to charge the crime of murder while committing and attempting to commit rape. Counsel for the defendant have failed to direct our attention to any authority supporting their contention, and we have been unable to find any. We are therefore of opinion that the district court did not err in refusing to sustain defendant's motion and demurrer upon this ground.

It is also contended that the indictment is bad for duplicity, because it contains an allegation that the defendant killed Pearl Taylor in attempting to or in perpetrating a rape upon her.  As above stated, the prosecution was instituted under the provisions of section 3 of the criminal code, which reads as follows: "If any person shall purposely, and of deliberate and premeditated malice, or in the perpetration or attempt to perpetrate any rape, arson, robbery, or burglary, or by administering poison, or causing the same to be done, kill another; or if any person, by wilful and corrupt perjury or by subornation of the same, shall purposely procure the conviction and execution of any innocent person, every person so offending shall be deemed guilty of murder in the first degree, and, upon conviction thereof, shall suffer death or shall be imprisoned in the penitentiary during life, in the discretion of the jury."  It will be observed from the language of the section above quoted that the crime of murder in the first degree is committed by the killing of a person either in the perpetration or in the attempt to perpetrate a rape.  It matters not whether the homicide be in the perpetration of the rape, or in the attempt to perpetrate it.  Under the well-recognized rules of pleading, the prosecution could join the various ways in which the crime may have been committed conjunctively, as it did in the second count of the indictment, in order to meet the proof, and this proposition is so elementary that it is not necessary to cite authoritity in support of it.

2. Defendant further contends that the district court erred in overruling his motion for a continuance.  It appears from the record that the crime charged in the information was committed on the 28th day of April, 1908; that the defendant fled the country, and for a long time his whereabouts could not be ascertained; that he was arrested in the state of California, and brought to Minden and confined in the county jail some time in the month of January, 1909; that an information had theretofore been

filed against him, and on the 29th day of March, 1909, the grand jury for the district court for Kearney county, then in session, returned the indictment upon which the defendant was tried; that on the next day defendant filed a poverty affidavit, as provided by section 508 of the criminal code, and J. L. McPheely, Esquire, was appointed as counsel to defend him; that McPheely thereupon called to his assistance the firm of Hamer & Hamer of Kearney, Nebraska, and on the 31st day of March, 1909, the motion to quash and the demurrer to the indictment heretofore mentioned was filed and overruled. Defendant thereupon filed his motion for a continuance, alleging as the principal ground therefor that Doctor S. J. Jones, a resident of Minden, Nebraska, and a practicing physician, was temporarily attending college, or taking a post graduate course at Vienna, Austria; that he would return to the city of Minden within four months, at which time defendant could procure his testimony; that Doctor Jones was a material witness for the defendant; that he attended Pearl Taylor after her injuries, and made a physical examination of her person, and that from such examination he would testify that no rape had been committed upon her. The motion for a continuance was overruled, but the court, in the exercise of a wise discretion, issued a commission to take the testimony of Doctor Jones, and also the testimony of one Doctor Martin, which was accordingly done, and the deposition of both of these physicians was produced by the defendant, and read in evidence upon the trial. It is not claimed that, had these witnesses been present in court, their testimony would have been other or different than it appeared in the depositions, and nothing is brought to our attention to show that the defendant was prejudiced because they were not personally present in court when they gave their testimony. We are therefore of opinion that the court properly overruled defendant's motion for a continuance.

3. Defendant complains of the district court for overruling his motion for a change of venue. An application

for a change of venue is addressed to the sound discretion of the trial court, and, unless there appears to have been an abuse of discretion which has resulted in depriving the defendant of some substantial right, the ruling on that question should be sustained. *Smith v. State,* 4 Neb. 277; *Lindsay v. State,* 46 Neb. 177; *Argabright v. State,* 62 Neb. 402; *Welsh v. State,* 60 Neb. 101; *Goldsberry v. State,* 66 Neb. 312; *Jahnke v. State,* 68 Neb. 154; *Sweet v. State,* 75 Neb. 263. In the instant case, the principal reason assigned for the application was that by reason of the enormity of the crime with which the defendant was charged, and the newspaper accounts thereof, the minds of the people of Kearney county were so inflamed against him that he could not obtain an unbiased jury, and have a fair and impartial trial in that county. Defendant supported his application by his own affidavit and the affidavits of his attorneys, to which were appended newspaper accounts of the tragedy published about the time of its occurrence. The application was opposed by the affidavits of a large number of reputable citizens of that county, who deposed to the effect that no such feeling existed against the defendant as would prevent him from obtaining a fair and impartial jury for the trial of his cause, and that, by reason of lapse of time, whatever excitement was created against defendant at the time the offense was committed had ceased to exist. It appears that the crime was committed more than a year before the trial took place; no attempt had been made to do violence to the defendant, no assault had been made upon him, and no public feeling exhibited against him by any one other than the father of his victim. An examination of the record satisfies us that the district court did not abuse his discretion in overruling the motion for a change of venue.

4. It is strenuously urged by defendant's counsel that the trial court erred in overruling their challenges for cause to several of the jurors, and many pages of the de-

54

fendant's brief are devoted to excerpts from the *voir dire* examination of the jury. Our attention is challenged to the examination of C. E. Wilson, who was called into the jury-box, and on cross-examination by defendant's counsel stated that he had read newspaper accounts of the transaction, from which he had formed some little opinion in relation to the guilt or innocence of the defendant, but that it would not require any evidence to remove that opinion. He was thereafter interrogated by the court as follows: "Q. Notwithstanding what you have heard or read, Mr. Wilson, can you say now that, if selected as a juror, you can render a fair and impartial verdict between the state of Nebraska and the defendant, Bert Taylor, disregarding what you have heard and read? A. Yes, sir. Q. And, if selected as a juror, would you do that? A. Yes, sir. Q. And you are confident that you could do that now? A. Yes, sir." Thereupon defendant's challenge was overruled.

The examination of venireman Harden Yensen, to whom defendant objected, discloses the same state of facts as testified to by Wilson; but, in addition thereto, counsel for the defendant questioned him as follows: "Q. Now, if selected as a juror, and remembering what you have read and heard, it would require some testimony to remove the impression you have in your mind? A. No, sir; not if I was retained as a juror. Q. But you say, 'if retained as a juror'; what do you mean by that? A. I mean, if I was retained as a juror, I am to drop what I have heard, and decide the case according to the evidence in the court here. * * * Q. You have an opinion in your mind now, is not it true, Mr. Yensen, that Pearl Taylor was murdered, and that Bert Taylor murdered her—you have that in your mind? A. I heard that; yes, sir. Q. And you believe that now? A. As far as the newspaper reports and rumor goes, I believe it. Q. And that opinion is such that would require evidence to remove it from your mind; that is, that Pearl Taylor has been murdered, and that Bert Taylor was guilty of the crime? A. Not if

I was retained·as a juror, it would not." The juror further testified that he could render a fair and impartial verdict on the evidence and the law of the case, and he was sure of that. It appears that the above named persons were peremptorily challenged by the defendant.

Complaint is also made of the retention of Chris Anderson, who served on the jury and acted as its foreman. It appears that Anderson had lived in Kearney county ten years; eight years of the time in Grant township, and the remaining two years about 12 miles from Minden, the county seat; that he had heard some talk in his neighborhood about the tragedy, and had read newspaper reports of it at or about the time it occurred; that he was not acquainted with any of the parties to it, or with any of the witnesses, and knew nothing about the facts of the case. When asked if he had any opinion as to the guilt or innocence of the defendant he said: "Sometimes I have, and other times I have doubts." He also stated that he could render a fair and impartial verdict according to the evidence. He was then examined by counsel for defendant, and testified in part as follows: "Q. From what you have heard and read, you formed an opinion as to whether a crime had been committed, didn't you? A. No; I have not done that—that a crime had been committed. Q. You are informed as to that? A. Yes. Q. And you have that opinion now, have you not? A. Yes, sir. * * * Q. You believe that now? A. Things have turned up since that I have my doubts. Q. You would require evidence to remove the impression that you have? A. Yes, sir." Thereupon, as provided by the statute, the juror was examined by the court: "Q. Now, Mr. Anderson, notwithstanding the opinion that you formed from what you heard and read that a crime had been committed, and notwithstanding the impression that may have been made at various times on your mind as to the guilt or innocence of the defendant, do you say now that you could enter upon the trial of this case and render a fair and impartial verdict between the state of Nebraska

and the defendant, Bert Taylor, without regard to what you have heard or read? A. Yes."

It appears from the record that practically the same state of facts existed as to all of the other veniremen and jurors objected to by defendant in his brief. That they were qualified jurors and were properly retained by the court is beyond question, unless we disregard that part of section 468 of the criminal code which reads as follows: "Provided, that if a juror shall state that he has formed, or expressed, an opinion as to the guilt or innocence of the accused, the court shall thereupon proceed to examine, on oath, such juror as to the ground of such opinion; and if it shall appear to have been founded upon reading newspaper statements, communications, comments, or reports, or upon rumor, or hearsay, and not upon conversations with witnesses of the transaction, or reading reports of their testimony, or hearing them testify, * *, * the court, if satisfied that said juror is impartial, and will render such verdict, may, in its discretion, admit such juror as competent to serve in such case." This provision has been upheld and given its proper force and effect in *Palmer v. People*, 4 Neb. 68; *Carroll v. State*, 5 Neb. 31; *Smith v. State*, 5 Neb. 181; *Basye v. State*, 45 Neb. 261; *Bolln v. State*, 51 Neb. 581; *Russell v. State*, 62 Neb. 512; *Jahnke v. State*, 68 Neb. 154. In *Ward v. State*, 58 Neb. 719, it was said: "A challenge of a juror for cause raises a question which is to be decided by the trial judge from a consideration of all the facts developed during his examination, and any circumstances which tend to enlighten upon the matter; and of these are the appearance and actions of the juror while undergoing the examination. An opinion or impression of a juror formed from reading newspaper reports and hearing general rumors, of none of which he has a settled belief, but expresses rather disbelief or disregard, is hypothetical and does not disqualify him if he also states that he can render a fair and impartial verdict based solely upon the evidence and wholly without the

interference of such opinion or impression. * * * The decision of a challenge of a juror for cause will be sustained on review if not clearly wrong."

After reading the evidence we have no doubt of the fact that each of the jurors objected to by the defendant qualified himself within the language of the statute and the rule announced by the foregoing decisions. It was evidently the purpose and intention of the legislature, in adopting the statutory provision above quoted, to raise the standard of juries in this state. We are of opinion that ignorance and indifference to what transpires in the community where a juror resides, and lack of reading, of knowledge and of general information are not calculated to best qualify him to serve his state in the capacity of a trial juror. The mere fact that a person takes interest enough to read newspapers and inform himself upon the current events of the day should not disqualify him from acting in that capacity, if he can truthfully say that, notwithstanding what he has heard by way of common rumor and read in the way of newspaper accounts, he could render a fair and impartial verdict upon the law and evidence in the case.

Complaint is also made because the trial court allowed the state to ask certain of the jurors whether they had conscientious scruples against capital punishment. One of the statutory grounds of challenge for cause on the trial of an indictment for an offense, the punishment whereof is capital, is that the juror's opinions are such as to preclude him from finding the accused guilty of an offense punishable with death. Criminal code, sec. 468. This provision of the statute has been upheld in *St. Louis v. State,* 8 Neb. 405; *Bradshaw v. State,* 17 Neb. 147; *Johnson v. State,* 34 Neb. 257; *Rhea v. State,* 63 Neb. 461. It thus appears that this question is so well settled that a further discussion of it is unnecessary, and it must be resolved against the defendant's contention. We are therefore of opinion that there was no error committed

by the district court in the impaneling of the jury in this case.

5. Defendant assigns error in giving and refusing instructions, and contends: (1) That the court erred in giving instructions numbered 36 and 37. Those instructions treat of the nature and effect of circumstantial evidence. Neither their form nor the substance is assailed, but it is contended that there was no circumstantial evidence in this case, and therefore it was reversible error to give them. In this we think the attorneys for the defendant are mistaken. It must be remembered that the defendant was convicted of murder while perpetrating and attempting to perpetrate a rape. No one saw the transaction, and no one was present when the crime was committed but the defendant and his victim. The defendant did not testify, and his victim was so badly injured that she never regained consciousness, and was never able to speak of the matter. So it was necessary for the state to resort to the facts, circumstances and conditions surrounding the transaction as shown by the testimony of the sister of the deceased, together with the condition in which he left his victim, his subsequent flight and conduct, as circumstances tending to prove the manner in which the crime was committed, and in support of the allegations of the second count of the indictment. It was therefore entirely proper for the court to instruct the jury on the question of circumstantial evidence. (2) Error is also assigned for the giving of instructions numbered 46 and 47. Those instructions treat of the question of insane delusions, and it is now contended that there was no evidence before the jury upon that question, and therefore a new trial should be awarded. An examination of the record discloses that counsel for the defendant did not contend that he had not committed the acts complained of, but attempted to defend on two grounds; one of which was that he was insane, and therefore not responsible for his acts; and the other that at the time the transaction took place he was intoxicated to such an ex-

tent as to render him wholly irresponsible for his acts. Having attempted to establish the defense of insanity, it was proper for the court, if there was evidence enough to justify it, to instruct the jury upon that question, which of course would include the matter of insane delusions. Again, there is evidence in the record that the defendant had stated to the deceased, and her sister Ida, that their father had in some manner injured him; and he complained to his victim, shortly before the tragedy, that her deceased sister, who was his wife, had been guilty of infidelity toward him, and that he would get even with them. There was no evidence introduced from which it could be inferred that he had any just cause to believe either of the above statements, and it was not improper for the court to treat them as the result of delusions, and instruct the jury upon that question. While we do not approve of instruction 47, it responds to a matter of defense interposed by the accused, and the defendant was not prejudiced thereby. (3) Complaint is also made of the instructions given upon the question of intoxication. We have examined those instructions, and find that they are in form and substance the same as are usually given in such cases and have many times been approved by this court. In considering this question, it is proper for us to say that the record contains no competent evidence of intoxication, and the court could have refused to instruct upon this question at all. In fact the instructions complained of were given solely because of the contentions made by the defendant, and submitted to the jury his attempted defenses of insanity and intoxication. Therefore, if the instructions were erroneous, in any particular, it was error without prejudice.

Many other criticisms are made of the instructions. For example, counsel for the defendant quote the following: "It must appear from the evidence, beyond a reasonable doubt, that the defendant, and not somebody else, committed the offense charged in either count of the indictment." This statement is severely criticised, and it is

stated that there was no intimation that any other person committed the act in question. This statement is incorrect, for we find in the record a letter written by the defendant to the sheriff of Kearney county, while the accused was a fugitive from justice, and which was introduced as a part of his defense, in which he charged that a certain person other than himself (describing him) was guilty of the crime, and that he was pursuing such person with a view of bringing him to justice. The foregoing example is given solely for the purpose of illustrating the fact that many of the defendant's criticisms are without any substantial merit.

6. Defendant further alleges misconduct of the jury, and the bailiff in charge of the jury, after the cause was submitted. It is asserted that the bailiff took the jury to a picture gallery, owned by his wife, and had their photograph taken, and this, it is strenuously contended, entitles the defendant to a new trial. While we do not approve of this transaction, we find that it is nowhere shown that the jury were guilty of any improper conduct; that they communicated with any one, or that any one was permitted to communicate with them on that occasion; and there is nothing in the record to indicate that anything occurred at that time which could in any manner prejudice the defendant's rights.

Complaint is also made because the jury were taken, in a body, to the Methodist church on the Sabbath day for the purpose of Sunday worship; and in support of this assignment counsel direct our attention to the case of *Shaw v. State*, 83 Ga. 92. That was a case where, during the progress of the trial, the bailiff in charge of the jury took them to a prayer-meeting, which was being conducted by the *public prosecutor*. The court said: "When they arrived there, they were shown to their seats by the prosecutor, who provided for them a place apart from the remainder of the congregation, and who led the services and addressed the congregation. Prayers were offered for the court and its officers. How long they remained

there does not appear. For aught that appears in the record the house may have been crowded. One of the grounds of the motion alleges that there was 'shouting' at the meeting. What influence this shouting and religious excitement may have had upon the minds of the jury does not appear. It does not appear that Mr. Hooten, the prosecutor, was not among those who shouted. The jury seeing this going on, and seeing this prosecutor filled with religious zeal and fervor, may have reasoned in their minds, and doubtless did, that this man, who was the active prosecutor of the defendant, who assisted in the selection of themselves as jurors in the case, and who testified before them as a witness, by his conduct and declaration at the prayer-meeting showed that he was a good and upright man, and that such a man would not prosecute the defendant unless he believed him to be guilty. Some of them were perhaps members of his congregation, and looked up to him as their pastor and spiritual guide." It was held that under such circumstances a new trial should have been granted. In the case at bar, however, it is not claimed that the sermon delivered by the pastor on that occasion contained any reference whatever to the defendant, the crime with which he was charged, or to the trial which was then in progress, or that anything occurred which might prejudice the defendant or influence the jury in the slightest degree in arriving at their verdict. We are therefore of opinion that the case cited is so clearly distinguishable from the facts in the case at bar as to present no foundation for the defendant's criticism, and we are not willing to hold that the mere fact that during the progress of the trial, even in a capital case, the jury, accompanied by the bailiff, and properly guarded from outside influences, attended divine worship on the Sabbath day affords cause for setting aside their verdict.

7. It is contended as a seventh ground for a new trial that counsel for the state was guilty of misconduct in his closing argument to the jury. Without quoting the language complained of, it appears that the assistant prosecu-

tor in the closing argument charged counsel for the defendant with trifling with the jury and the court by presenting the defenses of insanity and drunkenness, when they knew, or ought to have known, that there was no merit in them. The language was called to the attention of the trial court and objected to, and the objection was overruled. While counsel may be guilty of such misconduct in argument to the jury as warrants the granting of a new trial, still in the case at bar we are of opinion that the argument was, as held by the court, within the limits of fair and reasonable discussion; and we are of opinion that the evidence by which it was sought to establish those defenses was so slight and trifling as to merit the criticism indulged in by counsel for the prosecution.

8. It is further contended that the court erred in adjourning the trial from Saturday night, May 29, to Tuesday morning, June 1. It appears that May 31 was to be observed as "Decoration Day"; and, instead of holding court on that day, it was treated as a legal holiday, and the trial was adjourned until Tuesday, the day following. It is not suggested in the argument that this could work any prejudice to the defendant's substantial rights, and this criticism of the court as to the manner of conducting the trial is so unwarranted that we would be justified in ignoring it altogether. It certainly affords no ground for a new trial.

9. Finally, it is contended that the verdict is contrary to the evidence. In discussing this assignment of error, the testimony of the witnesses will not be quoted. As above stated, it is not seriously contended that the defendant did not commit the acts complained of. Counsel in their brief, at page 14, say: "As before stated, and as will be more particularly argued, we think, as appears by the evidence, that the jury were justified in so finding, that a horrible act had been committed. That is to say, and we mean exactly what we say, that the jury were justified in finding that the plaintiff in error strangled and choked the said Pearl Taylor, and of such injuries she lingered

and died." It was stated by counsel that the defendant denied that he committed a rape upon Pearl Taylor. Upon this point a careful examination of the evidence satisfies us that the jury were fully justified in determining that question against him. So the only questions left for the determination of the jury were whether or not there was sufficient evidence before them to sustain the defense of insanity or intoxication. Upon these questions we have carefully read the evidence. It appears that Doctor Andrews of Hastings, who it may be conceded is a man eminent in his profession, examined the defendant, for the first and only time, during the progress of the trial, which was more than a year after the crime was committed. He testified that at the time he examined him he found him in a nervous condition, with an accelerated pulse; that his temperature was above the normal; that he had exaggerated reflexes, which to him indicated that the mind and brain were not in their normal condition, and that he found evidences of insanity. To quote his own words, he said: "I find that with the short examination which was made, but upon which no man could make a positive diagnosis, that there are signs of insanity." The doctor, however, refused to testify that the defendant was insane even at the time he examined him, much less would he testify as to the condition of his mind when the crime was committed.

The testimony of Doctor Shields, who was the other witness produced by the counsel for the defendant on the question of insanity, disclosed that he examined the defendant for the first time during the progress of the trial; that he found the defendant's tongue coated and tremulous; that he had exaggerated reflexes, especially of the knee; that there was an increased pulse; that he had an idea that he was being unjustly persecuted, which is a symptom of insanity; that he observed from his actions a tendency to depressive melancholia, which is one of the symptoms of insanity, and is one of its forms. It appears, however, upon his cross-examination, that he was only

with the defendant, the first time, for about 10 minutes; that he examined him again shortly afterwards, and was with him about 15 or 20 minutes; that all of the symptoms he saw might have been the result of other causes than that of insanity; that his increased pulse might have been caused by the trial, which was progressing, and that all of the symptoms which he described could exist without insanity. He was finally asked: "Q. Can you say to this jury whether on the 28th day of April, 1908, this man was in such a mental condition that he did not know the difference between right and wrong with respect to the murder of a human being?" To this question he answered, "I couldn't say so." This is all the evidence introduced by the defendant even tending to establish the defense of insanity.

Upon the question of his intoxication, several witnesses were examined both for the prosecution and the defense. It appears beyond question that before the transaction complained of the defendant drank two, or perhaps three, glasses of beer, during a time extending from about 7 o'clock in the evening up to near midnight; that he played pool with some companions at a pool-hall in the city of Minden; that he told them he was going to leave the following morning, and called them up to drink with him on one occasion, stating that it was probably the last time that they would have a chance to drink at his expense. All of these persons, except one, testified that they observed nothing in his conduct, his walk, his appearance, or his conversation, which would indicate that he was under the influence of intoxicating liquor. One of defendant's companions, a person of the name of Peterson, testified that he played pool with the defendant on the evening in question until about 9 o'clock; that he saw the defendant after the pool-hall closed, which was about 11 o'clock that night; that he thought he was a little bit under the influence of liquor. It is not claimed that Peterson saw the defendant drink any intoxicating liquor, and it appears that his belief was founded on the fact that

he had been able to beat the defendant while playing pool, and that he had theretofore thought the defendant was a better player than he was. His testimony was: "Q. You thought, you say, that he was somewhat under the influence of liquor? A. Yes, sir; I kind of thought he was. Q. To what extent would you say? A. I didn't hardly know; I thought he had been drinking a little. Q. How did it manifest itself to you? A. I thought I could tell from his appearance—his countenance and eyes. Q. And his face? A. Yes, sir. Q. Could you tell it in any other way? A. I didn't notice it." This being all of the evidence tending to show that the defendant was intoxicated, and all the other persons who saw him and conversed with him on that evening, up to within an hour of the commission of the crime, having testified positively that he exhibited no signs of intoxication whatever, it seems clear that the jury were justified in finding against him on that question.

Before concluding this opinion, we desire to say that in consultation it was suggested that the record fails to show that the district court, in pronouncing the sentence in this case, informed the defendant that a verdict of guilty had been found against him, and for that reason the judgment rendered upon the verdict should be set aside, and the court asked to comply with that statutory requirement and thereafter resentence the defendant. It appears, however, that defendant failed to mention that matter either in his original motion for a new trial or in his motion, as amended, after sentence was pronounced against him, and we therefore conclude that the court did, as a matter of fact, strictly comply with all the requirements of the statute, or that the defendant and his counsel elected to waive the omission, if it actually occurred. In *Bond v. State*, 23 Ohio St. 349, the supreme court of Ohio said: "Where the record does not show that the court, before passing sentence upon the defendant, informed him of the fact that a verdict of guilty had been found against him, as required by the criminal code

(66 Ohio L. 313, sec. 169), in the absence of a bill of exceptions showing the contrary, the fact that such information was so given will be presumed." Our criminal code on this point is a copy of the Ohio statute, and the decision of the court of last resort in that state in disposing of this question may safely be followed by us. We have not overlooked the cases of *McCormick v. State,* 66 Neb. 337, and *Evers v. State,* 84 Neb. 708, and it is not our intention to criticise or overrule them, but we have concluded, because of the purely technical nature of this provision, to require the defendant to raise that question by motion for a new trial or otherwise, and thus enable the district court to correct such omission, if it really exists, and literally comply with this formal and perfunctory requirement of the statute. If that is not done, it should be presumed that this formal provision of the statute has been observed.

A careful examination of the entire record leads us to the conclusion that the jury could not have acquitted the defendant on any theory of the case, and that the only debatable question for them to consider was whether defendant's punishment should be death or imprisonment for life.

Finding no reversible error in the record, the judgment of the district court is affirmed, and Friday, the 28th day of October, A. D. 1910, is hereby fixed for carrying into execution the judgment of the district court.

AFFIRMED.

REESE, C. J., dissenting.

Instructions numbered 46 and 47 are taken from Good and Corcoran, Nebraska Instructions to Juries, pp. 249, 250. They are here copied: No. 46, "You are instructed that it is not every delusion that can be considered as an insane delusion and which would exempt a person from punishment; that if a person labors under a delusion regarding some particular subject or person only and is not in other respects insane he is considered in law in

the same situation as to responsibility as if the facts with respect to which the delusion exists were real. If under the influence of his delusion a person supposes another man to be in the act of taking his life and kills the man as he supposes in self-defense, he would be exempt from punishment; but if his delusion was that 'deceased had done a serious injury to his property or business and he kill him in revenge for such supposed injury, having at the time a degree of reason sufficient to control his actions and judgment and being able to distinguish between right and wrong with respect to the act charged, he would yet be liable to punishment notwithstanding such delusion might exist, because, if real, it would not justify the taking of human life." No. 47: "Something has been said in these instructions about insane delusions. It is not every delusion that can be considered as an insane delusion. The delusion must be of such a character that if things were as the delusion imagined them to be, they would justify the act springing from the delusion. To illustrate: If a person be under the insane delusion that he is the Almighty himself, or is directly commissioned or commanded by the Almighty himself to shoot a particular person that the Almighty has decided must be shot, and he is moved by such delusion alone to the shooting, that would be an insane delusion, because if true would justify the shooting. But if a person be under the delusion that some man has done him a mean trick and that he ought to be shot for it, and the delusion moves the person to shoot the man, that is no excuse on the ground of insane delusion, because if the fact had really been that the man had done the person a mean trick just imagined, it would not justify the shooting. An insane delusion is like a waking dream. The subject can neither be reasoned into it nor out of it. It may throw some light on the application of the subject to this case to consider whether a conviction in this case would have a tendency to prevent a repetition of such acts." The former was given in *Walker v. State,* 46 Neb. 25; the

latter is from *Thurman v. State*, 32 Neb. 224. I copy both for the reason, in part, that, in my opinion, the courts should refrain from copying instructions blindly from the books on instructions, without reference to repetitions. The whole of the two instructions applicable to this case could have been condensed into one intelligible instruction and thus made to apply to the facts of the case as reflected by the evidence. My particular criticism is as to the closing portion of No. 47: "An insane delusion is like a waking dream." Indulging in the presumption of the high intelligence of jurors with which they should be credited, we conclude they fully understood the purport of this language, yet it is difficult for the writer to comprehend its meaning. However, we cannot say plaintiff in error was prejudiced by the comparison. The instruction continues: "The subject can neither be reasoned into it nor out of it. It may throw some light on the application of the subject to this case to consider whether a conviction in this case would have a tendency to prevent a repetition of such acts." It is true that the whole portion of the instruction above quoted was given in *Thurman v. State*, *supra*, but what was that case? Thurman was prosecuted for shooting Parker with intent to kill. Upon final conviction he was sentenced to the penitentiary for the term of three years. Chief Justice Cobb, in discussing this part of the instruction, at page 229, says: "It was an abstract proposition in moral economy to be considered by the jury, in its relation to the prisoner, and in his relation to the public, and we see no prejudicial error in the proposition. It, at least, is suggestive of doubt as to the propriety of conviction." Preceding this language the chief justice said: "However weak that evidence as to insanity and delusion might be, would his conviction, under the circumstances, tend to prevent a repetition of such acts?" In this language it is clearly held that the instruction suggested that "in his relation to the public" the conviction of the accused might prevent a repetition of the crime, by him, of which

he was charged. The case was not a capital one. Parker was not killed. Was the mental condition of Thurman such that a punishment for the shooting could or would deter him from the commission of similar offenses, a "repetition"? Viewed in that light, a strong hint was given to the jury that they might "consider whether a conviction in this case would have a tendency to prevent a repetition of such acts" by the accused. They evidently "saw the point." His conviction would probably have that effect. Under the circumstances of this case, the instruction may not have been to the prejudice of the accused, but that the language quoted from an instruction in a dissimilar case was useless, if not worse than useless, cannot be doubted.

As I take it, the construction given section 3 of the criminal code by the cases of *Morgan v. State,* 51 Neb. 672, and *Rhea v. State,* 63 Neb. 461, and followed in this case, will cause that section to read: If any person shall in the perpetration or attempt to perpetrate any rape, arson, robbery, or burglary, or by administering poison, or causing the same to be done, kill another, every person so offending shall be deemed guilty of murder in the first degree. By this construction all idea of purpose or intent to kill and all idea of deliberate and premeditated malice are effectually eliminated. Let us illustrate: By the section defining arson, the burning of any building of the value of $50, or containing property of the value of $50, or the burning of any bridge or water craft of the value of $50, wilfully and maliciously, is declared to be arson. A building may be of the value of $5, yet if it has property within it of the value of $50 the crime is the same. For these offenses the penalty may be imprisonment in the penitentiary from one to twenty years; yet, if in the *attempt* to burn such building, criminally, the accused, with no intention to injure any one personally, by accident or otherwise, "kill another", he is guilty of murder in the first degree, and, by law, may suffer the

55

penalty of death. By the same rule, if death is caused by "administering poison, or causing the same to be done", with no intent or purpose to kill, but death ensue, the person administering the poison or causing it to be done is guilty of murder in the first degree and may be caused to meet a similar fate. Other illustrations are suggested by the provisions of the statutes, but this is deemed sufficient to demonstrate the barbarous character of the rule announced. I need say no more upon this subject than to refer to the dissenting opinion by Judge SEDGWICK in *Rhea v. State,* 64 Neb. 889, which is, to my mind, a correct statement of the law.

SEDGWICK, J., I concur in the foregoing dissent.